State *v.* Noyes.

STATE *versus* EDWIN NOYES, *Appellant.*

The Legislature, in granting the charter of the Penobscot and Kennebec Railroad Company, adjudged that the railroad was required by public necessity and convenience; and this decision is conclusive.

This charter conferred upon the directors of the company the right to exercise certain powers, without interference by the Legislature, unless the company should, in some way, abuse the privileges granted; and, whether there has been an abuse of these privileges, is a question to be decided by the Court, and not by the Legislature.

The charter is a private contract between the government, acting in its sovereign capacity, and the corporation, binding on both, and cannot be changed or impaired by the Legislature. It is to be construed exclusively by the Courts, upon the same principles which are applied to contracts between private individuals.

The privileges thus granted may be taken for public use in the same manner as the property of individuals; but the intention of the Legislature to do so must clearly appear, and provision must be made for compensation to the owners of the property taken.

If the Legislature charter a railroad between certain *termini*, and it is constructed and put in operation, another railroad may be chartered between the same *termini*, unless, in the first charter, there is a limitation of the power of the Legislature to do so.

The charter of the Penobscot and Kennebec Railroad Company vests in the directors the power to prescribe the times and places at which it will receive persons and property for transportation.

The Act of March 26, 1858, is an interference with this right, and some power of the Legislature, other than that reserved in the charter, must be found to justify such interference; duties and obligations, additional to those required by the charter, being thereby imposed upon the company.

The Penobscot and Kennebec, and Somerset and Kennebec Railroads, being *crossing* and not *connecting* roads, their relative position imposes upon them no duties, in respect to receiving persons and property for transportation, that do not fall upon railroads situated in the vicinity of each other without crossing.

Private corporations, without any express reservations of the powers over them, in their charter, by the Legislature, are subject, like individuals, to be restrained, limited and controlled in the exercise of powers granted, by such laws as the Legislature may pass, based upon the principle of *safety* to the public.

*Police regulations*, established by the Legislature for the *convenience* of the public, or travelers on railroads, cannot be upheld against individuals or private corporations.

State *v.* Noyes.

The provisions of sections five and six of the Act of March 26, 1858, being in violation of the rights secured to the Penobscot and Kennebec Railroad Company, in their charter, are not binding on that corporation.

ON EXCEPTIONS from the ruling, *pro forma*, of TENNEY, C. J.

Complaint founded on sections five and six of chapter thirty-six of the statutes of 1858. It was commenced before a justice of the peace, before whom the respondent pleaded "Not guilty," upon which issue he was convicted, and, from the conviction, appealed. In this Court, the respondent had leave to retract his plea before the justice, and pleaded a special plea in bar of the further prosecution of the complaint.

To this plea the County Attorney, in behalf of the State, demurred generally, and the respondent joined the demurrer.

The presiding Justice sustained the demurrer, and ruled, *pro forma*, that the plea was not sufficient to bar or preclude the State from prosecuting said complaint against the respondent. To which ruling the respondent excepted.

The complaint charges that the respondent, "at Fairfield, in the county of Somerset, on the tenth day of January, A. D., 1859, was superintendent of the Penobscot and Kennebec railroad, which said railroad was then and there located and situated by authority of law, and then and there, in said town of Fairfield, in said county, crossed the railroad of the Somerset and Kennebec Railroad Company, a corporation established by the laws of the State, and which then and there, and for a long time previous thereto, had a railroad located and situated in, and extending through said town of Fairfield, by authority of law, and then and there crossing said Penobscot and Kennebec railroad; and, on the tenth day of January aforesaid, at said Fairfield, the passenger trains on said railroads were both due at the aforesaid point of crossing of said railroads in said town of Fairfield, at the same hour, to wit, at five of the clock in the afternoon; and the passenger train of the aforesaid Penobscot and Kennebec Railroad Company arrived at said crossing before the passenger train of the said Somerset and Kennebec Railroad Company arrived

State *v.* Noyes.

at said crossing, and the train of the said Penobscot and Kennebec railroad did not then and there wait at the station near such crossing until the arrival of the passenger train of said Somerset and Kennebec Railroad Company, and said passenger train of said Somerset and Kennebec Railroad Company did then and there arrive at said crossing within twenty minutes after the arrival then and there of said passenger train of said Penobscot and Kennebec railroad, contrary to the form of the statute in such case made and provided, and against the law and peace of the State."

Sworn to in due form.

The matter specially pleaded in bar by the respondent is as follows :—

"And the said Edwin Noyes, in his own proper person, comes into Court here, and, by leave of said Court, retracts his plea to said complaint, as heretofore pleaded, and, for a plea in this behalf, the said respondent, by leave of Court here for this purpose first had and obtained, says, that said State ought not further to prosecute the said complaint against him, the said Edwin Noyes, because, he saith, that although true it is, as set forth in said complaint, that the Somerset and Kennebec railroad, which extends from Augusta to Skowhegan, through the town of Fairfield, and the Penobscot and Kennebec railroad, which extends from Waterville to Bangor, through said town of Fairfield, did, on said 10th day of January, A. D., 1859, cross each on the same level at a place called Kendall's Mills, in said town of Fairfield, but did not connect with each other; and at the time mentioned in said complaint the afternoon passenger trains of cars from Augusta to Skowhegan on the Somerset and Kennebec railroad, and from Waterville to Bangor on the Penobscot and Kennebec railroad, were due at said point of crossing at the same hour, and that the said train from Waterville on said Penobscot and Kennebec railroad did arrive at said point of crossing before the said train of said Somerset and Kennebec railroad arrived at said point of crossing, and on arriving at its station at Kendall's Mills

aforesaid, and near to the crossing aforesaid, at the .time it was due so to arrive, did not there wait until the arrival there of said passenger train of said Somerset and Kennebec Railroad Company; and said train on said Somerset and Kennebec railroad, which was then and there due, did then and there arrive within twenty minutes after the arrival then and there of said passenger train on said Penobscot and Kennebec Railroad Company, but said train on the Penobscot and Kennebec railroad, after delivering at said station its passengers and receiving them, immediately proceeded over said crossing to Bangor, as it is alleged in said complaint; nevertheless the respondent says, that the Penobscot and Kennebec Railroad Company was created by, organized under, and, on said tenth day of January, did exist, and still exists, by virtue of an Act of the Legislature of Maine, approved April 7, 1845, which is as follows, viz. :—"

The plea recites the charter of the Penobscot and Kennebec Railroad Company, the sections of which, material to the issue, are the following :—

"SECT. 4. Said corporation shall have power to make, ordain and establish all necessary by-laws and regulations, consistent with the constitution and the laws of this State, for their own government, and for the due and orderly conducting of their affairs and the management of their property.

"SECT. 5. The president and directors. for the time being are hereby authorized and empowered, by themselves or their agents, to exercise all the powers herein granted to the corporation, for the purpose of locating, constructing and completing said railroad, and for the transportation of persons, goods and property, of all descriptions, and all such power and authority for the management of the affairs of the corporation as may be necessary and proper to carry into effect the objects of this grant; to purchase and hold within or without the State, land, materials, engines and cars, and other necessary things, in the name of the corporation, for the use of said railroad and for the transportation of persons, goods and property of all descriptions: to make such

equal assessments, from time to time, on all the shares in said corporation, as they may deem expedient and necessary in the execution and the progress of the work, and direct the same to be paid to the treasurer of the corporation. And the treasurer shall give notice of all such assessments; and, in case any subscriber or stockholder shall neglect to pay any assessment on his share or shares, for the space of thirty days after such notice is given as shall be prescribed by the by-laws of said corporation, the directors may order the treasurer to sell such share or shares at public auction, after giving such notice as may be prescribed as aforesaid, to the highest bidder, and the same shall be transferred to the purchaser; and such delinquent subscriber or stockholder shall be held accountable to the corporation for the balance, if his share or shares shall sell for less than the assessments due thereon, with the interest and costs of sale; and shall be entitled to the overplus, if his share or shares shall sell for more than the assessments due, with interest and costs of sale. *Provided, however,* that no assessment shall be laid upon any shares in said corporation of a greater amount, in the whole, than one hundred dollars.

"SECT. 6. A toll is hereby granted and established for the sole benefit of said corporation, upon all passengers and property of all descriptions, which may be conveyed or transported by them upon said road, at such rate as may be agreed upon and established from time to time by the directors of said corporation. The transportation of persons and property; the construction of wheels; the forms of cars and carriages; the weights of loads, and all other matters and things in relation to said road, shall be in conformity with such rules, regulations and provisions as the directors shall from time to time prescribe and direct.

"SECT. 7. The Legislature may authorize any other company or companies to connect any other railroad or railroads with the railroad of said corporation, coming from a northerly or easterly direction. And said corporation shall receive and transport all persons, goods and property of all descrip-

tions, which may be carried and transported to the railroad of said corporation on such other railroads as may be hereafter authorized to be connected therewith, at the same rates of toll and freight as may be prescribed by said corporation, so that the rates of toll and freight on such passengers and goods and other property as may be received from such other railroads, so connected with said railroad as aforesaid, shall not exceed the general rates of freight and toll on said railroad received for freight and passengers at any of the deposits of said corporation.

" Sect. 12. The said corporation shall at all times, when the postmaster general shall require it, be holden to transport the mail of the United States from and to such place or places on said road as required, for a fair and reasonable compensation. And, in case the said corporation and the postmaster general shall be unable to agree upon the compensation aforesaid, the Legislature of the State shall determine the same. And the said corporation, after they shall commence the receiving of tolls, shall be bound at all times to have said railroad in good repair, and a sufficient number of suitable engines, carriages and vehicles for the transportation of persons and articles, and be obliged to receive, at all proper times and places, and convey the same, when the appropriate tolls therefor shall be paid or tendered, and a lien is hereby created on all articles transported for said tolls. And the said corporation, fulfilling on its part all and singular the several obligations and duties by this section imposed and enjoined upon it, shall not be held or bound to allow any engine, locomotive, cars, carriages or other vehicle for the transportation of persons or merchandize to pass over said railroad, other than its own, furnished and provided for that purpose, as herein enjoined and required:—*Provided, however*, that said corporation shall be under obligations to transport over said road, in connection with their own trains, the passenger and other cars of any other incorporated company that may hereafter construct a railroad connecting with that hereby authorized, such other company being subject to all the provisions

of the sixth and seventh sections of this Act, as to rates of toll and all other particulars enumerated in said sections.

"SECT. 17. The Legislature shall at all times have the right to inquire into the doings of the corporation and into the manner in which the privileges and franchises herein and hereby granted may have been used and employed by said corporation, and to correct and prevent all abuses of the same, and to pass any laws imposing fines and penalties upon said corporation, which may be necessary, more effectually, to compel a compliance with the provisions, liabilities and duties, hereinbefore set forth and enjoined, but not to impose any other or further duties, liabilities or obligations. And this charter shall not be revoked, annulled, altered, limited, or restrained without consent of the corporation, except by due process of law."

The plea also recites the Acts of June 3, 1851, and section 8, of the Act of March 29, 1853, extending the time of the location of said railroad, and alleges " said Acts were, on said tenth day of January, 1859, and are still, in full force; and, under said charter and Acts the said company had, on said tenth day of January, constructed and put in operation said railroad from Waterville to Bangor, connecting at Waterville with the railroad of the Androscoggin and Kennebec Railroad Company, and had done and performed every thing required by said Acts to be done and performed on its part, and had not then, and has not now, lost or forfeited any of its rights, privileges, immunities or powers granted by said charter."

It then recites the tenth section of the Act of April 1, 1856, authorizing the lease of the Penobscot and Kennebec railroad to the Androscoggin and Kennebec Railroad Company, the lease made in pursuance of that authority, and the charter of the latter company.

By the lease the control of the running of the trains on the Penobscot and Kennebec railroad is transferred to the Androscoggin and Kennebec Railroad Company. The charter of the latter company, so far as material in this case, is identical

with the corresponding provisions in the charter of the former.

The plea alleges the execution, &c., of the lease, and that the Androscoggin and Kennebec Railroad Company had taken and retained the possession and management of the Penobscot and Kennebec railroad, and proceeds as follows:—

"Under and by virtue of which Act said last named company had constructed, and were and still are operating their said railroad from Waterville, aforesaid, to Danville Junction, in the State of Maine; and the Androscoggin and Kennebec Railroad Company, by virtue of the authority granted in said charter of the Penobscot & Kennebec Railroad Company, and transferred by virtue of the lease as aforesaid, to themselves, on the said tenth day of January, 1859, were, and ever since have been, running trains of cars for the transportation of persons and property from Waterville to Bangor, over said Penobscot and Kennebec railroad; and the directors of said Androscoggin and Kennebec Railroad Company had, prior to said tenth day of January, prescribed and directed, among the 'rules, regulations and provisions' for the management of said trains, that the afternoon passenger train, mentioned in said complaint, leaving Waterville at forty-three minutes past four of the clock in the afternoon, should arrive at said Kendall's Mills station, near the crossing of said railroads, at fifty-two minutes past four of the clock, and having received the passengers at that station, and delivered such as were to be there left, said train should thereupon immediately leave said station, and proceed on over said crossing to Bangor, without any delay or stop; which said rule and regulation was in force on said tenth day of January aforesaid, and still is in force.

"And this respondent further avers that at the time aforesaid, and long before and ever since, he was employed by said Androscoggin and Kennebec Railroad Company as the superintendent of their road, and of the Penobscot and Kennebec railroad; and as such it was his duty to cause the trains of cars for the transportation of persons and property

to be run over said railroads, in accordance with such rules and regulations as the directors of said Androscoggin and Kennebec Railroad Company should from time to time prescribe and adopt; and that in accordance with the rule and regulation aforesaid, adopted and prescribed by the directors as aforesaid, he caused said train to leave said station at Kendall's Mills as complained of him, as it was lawful for him to do.

And the said respondent further avers that said complaint and prosecution against him has been commenced and is prosecuted under and by virtue of an Act of the Legislature of the State of Maine, approved March 26, 1858, which is in the words following, to wit:—

"An Act to secure the safety and convenience of travelers on railroads.—

" *Be it enacted by the Senate and House of Representatives in Legislature assembled,* as follows:—

[Sections 5 and 6 only appearing to be material the other sections of the Act are here omitted.]

"SECT. 5. When railroads cross each other, and passenger trains are due at such point of crossing at the same hour, it shall be the duty of the train first arriving to wait at the station near such crossing until the train upon the other road shall arrive; *provided* it shall so arrive in twenty minutes; and each train shall afford suitable opportunity for such passengers as desire it, (with their baggage,) to be changed to and transported on the other train.

"SECT. 6. Whenever the provisions of section five shall be violated, the superintendent of the road and the conductor and engineer of the train so transgressing, shall each be subject to a fine, to the use of the State, of not less than ten dollars nor more than fifty dollars, for each offence, to be recovered on complaint before any justice of the peace, or on indictment in the county where such violation shall occur."

Which said Act, if enforced in manner sought in said complaint and prosecution, is an infringement of the rights, powers, privileges and franchises granted in and by said Act

incorporating said Penobscot and Kennebec Railroad Company: and that said Act of March 26, 1858, under which this complaint is prosecuted, is contrary and repugnant to the tenth section and first article of the Constitution of the United States, and contrary to the Constitution of the State of Maine, and void. All of which the respondent is ready to verify and prove; whereupon he prays judgment, and that by the Court here he may be dismissed and discharged from the said premises in the said complaint above specified.

*Drummond,* in support of the exceptions, made the following points, which he elaborately argued:—

I. The Act of 1858 conflicts with the charter under which the respondent acted.

II. The charter is a contract which the Legislature cannot annul or modify, unless the power to do so was reserved in it.

III. In this charter such power was not reserved.

IV. It is not for the Legislature to determine what "are proper times and places for the corporation to receive persons and property for transportation."

V. This Act cannot be sustained under the right of government to take private property for public uses, because it does not purport to do so, nor provide for compensation to the owners.

VI. This is a *private* corporation, and not *public,* although it was authorized to take private property.

VII. The Legislature had the power to make this contract, though it might prevent future Legislatures from passing laws calculated to promote the public interest.

VIII. This Act is not an exercise of the right of eminent domain by the Legislature.

IX. It cannot be sustained under the police power of the State.

In respect to this power, corporations are placed on the same ground as natural persons, *to whom a similar grant has been made.*

This power cannot be exercised to promote the public *convenience,* but only for the public *protection.*

State *v.* Noyes.

The enactment of laws to promote the public *convenience* is an exercise of the right of *eminent domain,* and implies compensation in all cases.

*Snell,* County Attorney, *contra,* argued in support of the following positions:—

1. It appears, on an examination of the charters and statutes involved in this case, that the Legislature intended that the Penobscot and Kennebec railroad and the Somerset and Kennebec railroad should connect with each other.

2. These charters are qualified legislative grants.

3. The acceptance of the charter by a company creates, by necessity, an obligation to comply with the letter and spirit of the grant.

4. Such acceptance is, in legal contemplation, an agreement on the part of the company with the Legislature, that it will perform all the duties imposed by law, and be subject to all liabilities enjoined.

5. Any intentional non-compliance on the part of the corporation, in this respect, is an abuse in the exercise of its privileges and franchises, which the Legislature has a right to correct and prevent.

6. The Penobscot and Kennebec Railroad Company, by accepting the Act of 1853, have waived the provisions of their charter which prohibit interference by the Legislature.

7. This company has forfeited its charter by failing to locate their road within the time prescribed by law. At any rate, the plea fails to show any such location.

8. Corporations are subject to the general police power of the State in the same manner as individuals.

9. The right of control of the modes of travel, whether upon sea or land, resides in the State. This right is one of those essential attributes of sovereignty, of which the State cannot divest itself.

10. Any property granted by the State, whether a railroad franchise, or any other grant, may be taken for public use, without the consent of the owner, under the right of eminent domain.

11. The Legislature has the right to pass any law which is reasonable and for the benefit of the people, and its decision in this respect is conclusive.

12. In this charter the Legislature reserved the right to correct abuses of the franchise.

The Legislature has the power to determine *conclusively* whether there has been an abuse; and if it finds there has been, it can apply the remedy.

13. In passing the law of 1858, the Legislature did determine there had been an abuse of this charter by the company, and from this determination there is no appeal.

14. It follows, therefore, that said Act was passed by virtue of the reservation in this charter and is therefore binding on the corporation and all its officers.

*Appleton, Attorney General,* also argued for the State, and

*Rowe,* for the respondent, in reply.

The opinion of the Court was drawn up by

TENNEY, C. J.—It is charged in the complaint, that, on January 10, 1859, the defendant was superintendent of the Penobscot and Kennebec railroad, which said railroad was then and there located and situated by authority of law, and in Fairfield crossed the railroad of the Somerset and Kennebec Railroad Company, a corporation established by the laws of the State, &c., and that, at the time stated, the passenger trains on said railroads were both due at the point of crossing the same in said Fairfield, at the same hour, to wit, at five o'clock in the afternoon; and the passenger trains of the Penobscot and Kennebec Railroad Company arrived at said crossing before the passenger train of the Somerset and Kennebec Railroad Company arrived at said crossing, and the former train did not then and there wait at the station near said crossing until the arrival of the passenger train of the latter company, which train last named did then and there arrive at said crossing, within twenty minutes after the arrival of the said passenger train on the Portland and Kennebec railroad; contrary to the form of the statute, &c.

The defendant files a special plea, in which he recites the charter of the Penobscot and Kennebec Railroad Company, and the subsequent Acts, passed by the Legislature, in addition to the same; also the Act authorizing the lease of this road to the Androscoggin and Kennebec Railroad Company; together with the lease in pursuance of the provisions of the last named Act, alleging that they all were accepted, before the passage of the Act under which the complaint was made, and that there has been a compliance with all the requirements of the same.  The plea also recites the 8th section of an Act, entitled " an Act to provide for certain railroad connections for the European and North American Railroad Company," approved March 29, 1853, and the charter of the Androscoggin and Kennebec Railroad Company.  And it is alleged in said plea, that although true it is, as set forth in the complaint, that the Somerset and Kennebec railroad, and the Penobscot and Kennebec railroad, did, on the 10th day of January, A. D., 1859, cross each other on the same level at Fairfield, but did not connect with each other.  And it is alleged, that the Act of the Legislature, passed on March 26, 1858, if enforced in manner sought in said complaint and prosecution, is an infringement of the rights, powers, privileges and franchises granted in and by said Act of incorporation of said Penobscot and Kennebec Railroad Company, and said Act last named is contrary and repugnant to the 10th section and first article of the Constitution of the United States and contrary to the Constitution of the State of Maine, and is void.  To this plea the government filed a general demurrer.

From the facts alleged in the plea, and confessed by the demurrer, it does not appear that the Somerset and Kennebec Railroad Company sustain any relation to the Penobscot and Kennebec Railroad Company, excepting that they crossed each other, and this by necessity, from the fact that one terminus of the first named road is on a different side of the road last named from the other.  And it may not be

improper to remark that no other relation has been suggested in argument.

The charter of the Penobscot and Kennebec Railroad Company provides, in section 1, " that the company shall have and enjoy all proper remedies at law and in equity to secure and protect them in the exercise and use of the rights and privileges, and in the performance of the duties, hereinafter granted and required, and to prevent all invasion thereof, or interruption in exercising and performing the same, and said corporation shall be, and hereby are invested with all the powers, privileges and immunities, which are or may be necessary to carry into effect the purposes and objects of this Act, as hereinafter set forth."

By section 4, the corporation shall have power to " ordain and establish all necessary by-laws and regulations, consistent with the constitution and laws of the State, for their own government, and for the due and orderly conducting of their affairs, and the management of their property."

Section 5 provides, that " the president and directors for the time being are authorized and empowered, by themselves or their agents, to exercise all the powers herein granted to the corporation, for the purpose of locating, constructing and completing said railroad, and for the transportation of persons, goods and property of all descriptions, and all such power and authority for the management of the affairs of the corporation, as may be necessary and proper to carry into effect the objects of this grant."

By section 6, " a toll is granted and established for the sole benefit of said corporation, upon all passengers and property of all descriptions, which may be conveyed or transported by them upon said road, at such rate as may be agreed upon, and established from time to time by the directors of said corporation. The transportation of persons and property, the construction of wheels, the forms of cars and carriages; the weight of loads, and all other matters and things in relation to said roads, shall be in conformity with

such rules and regulations and provisions, as the directors shall from time to time prescribe and direct."

By section 12, " the corporation, after they shall commence the receiving of tolls, shall be bound at all times, to have said railroad in good repair, and a sufficient number of suitable engines, carriages and vehicles, for the transportation of persons and articles, and be obliged to receive, at all proper times and places, and convey the same, when the appropriate tolls therefor shall be paid or tendered," &c.

By section 17, " the Legislature shall, at all times, have the right to inquire into the doings of the corporation, and into the manner in which the privileges and franchises, herein and hereby granted, may have been used and employed by said corporation; and to correct and prevent all abuses of the same; and to pass any laws, imposing fines and penalties upon said corporation, which may be necessary more effectually to compel a compliance with the provisions, liabilities and duties herein before set forth and enjoined, but not to impose any other or further duties, liabilities or obligations. And this charter shall not be revoked, annulled, altered, limited or restrained, without consent of the corporation, except by due process of law."

Of the statute approved by the Governor, March the 26th, 1858, the 5th and 6th sections are as follows:—" When railroads cross each other, and passenger trains are due at such points of crossing at the same hour, it shall be the duty of the train first arriving to wait, at the station near such crossing, until the train upon the other road shall arrive; —*provided*, it shall so arrive in twenty minutes; and each train shall afford sufficient opportunity for such passengers as desire it, (with their baggage,) to be changed to, and transported on the other train." Whenever the provisions of section 5 shall be violated, " the superintendent of the road and the conductor and engineer of the train, so transgressing, shall each be subject to a fine, to the use of the State, of not less than ten dollars, nor more than fifty dollars for each offence, to be

recovered on complaint, before any justice of the peace, or on indictment in the county where such violation shall occur."

It is not doubted that, in granting the charter of the Penobscot and Kennebec Railroad Company, the Legislature had in view public improvement and benefit. It was upon this ground alone, that the company was allowed to take private property in the construction of the road, on paying a just compensation. Without such adjudication by the Legisture, that the road was supposed to be what public necessity and convenience required, made in some mode, express or implied, no basis would exist for such provisions. And this judgment, touching the question, which must have been presented to the Legislature, was conclusive.

The work, contemplated by the Act, was of great magnitude, requiring the expenditure of large sums of money, before it could be put into the operation designed; and, whether the enterprise would be attended with a remunerating return for the outlay was a question upon which unanimity of opinion could hardly be expected. Hence it could not be assumed that capital would be thus employed, without some guaranty was given in the charter, that no modification thereof should take place so that the privileges granted should be less valuable. Hence, after providing what was deemed important for the public good, the rights, before mentioned, were secured to the company, and the power of alteration on the part of the Legislature, by which new duties, liabilities and obligations; or by which the charter should be revoked, annulled, altered, limited or restrained, without consent of the company, excepting by due process of law, was expressly inhibited. The right was conferred, so that the directors of the company, in the matters enumerated, should prescribe rules and regulations according to their own judgment, without any interference of the Legislature, unless the company should in some way abuse the privileges granted. And, in determining whether they had been so abused, the power to judge is not left with the department of the government which conferred the privileges, but, according to the Act of incor-

poration itself, as before stated, "by due process of law;" though the Legislature might provide, by general legislation, fines and penalties for abuses, and modes in which they might be imposed; but, whether abuses of the privileges granted had taken place, in given cases, is exclusively with another department of the government to find. *Commonwealth* v. *Proprietors of New Bedford Bridge*, 2 Gray, 339.

The company being thus secured in its independence of the Legislature, and having the right by its directors to establish a toll, for the sole benefit of the corporation, upon all passengers and property of all descriptions, which might be conveyed and transported by them on the road, it was induced to construct the road and put it into operation, as the consideration of the grant in the charter. The Act of the Legislature thus became a contract between the government, acting in its sovereign capacity, with the company, founded on the mutual considerations moving from one party to the other. This contract is to be construed by the tribunal established for such purposes generally, on the same principles which are to be applied to contracts between private individuals; and, in both classes, the great question presented is, what was the intention of the parties? And the answer to this question, and the construction to be given to all such contracts, generally, is the appropriate and exclusive business of the judicial department.

The Act of incorporation was not only a contract between the Legislature and the company, but it was a private contract. It is true, that this is not admitted on the part of the government, but a reference to the cases cited on both sides will show that this question is well settled both on principle and authority. And this has been done, so clearly and so extensively, by arguments to which no satisfactory answer has been given by those who have denied the doctrine, that it would be an useless expenditure of time to do more than to refer to some of the numerous citations. And the result of them is, that the charter is a contract binding equally upon the government and the corporation. The privileges granted there-

by, absolutely, cannot be changed or impaired, by the Legislature alone, unless under a constitutional provision, which will be considered. *Dartmouth College* v. *Woodward*, 4 Wheat., 518; *Allen* v. *McKeen*, 1 Sum., 276; *Fletcher* v. *Peck*, 6 Cranch, 89; *New Jersey* v. *Wilson*, 7 Ib., 164; *King* v. *Dedham Bank*, 15 Mass., 454; *Charles River Bridge* v. *Warren Bridge*, 7 Pick., 344; *Yarmouth* v. *North Yarmouth*, 34 Maine, 411; *Boston and Lowell Railroad Corporation* v. *Salem and Lowell Company & als.*, 2 Gray, 1.

It is insisted, on the part of the government, that the Legislature is limited in the exercise of this power, to some extent; and that it is not competent for them to barter away absolutely, beyond recall, the rights of the public, which may afterwards become essential to its good; and if this department of government are not subject to some restraint in this respect, the power to provide for public improvement will be diminished, and may be eventually lost. This proposition has no support in right reason or sound law. The Constitution has guarded the rights of the people, so that they are exposed to no danger from the exercise of this authority, which is apprehended to be so perilous.

Private corporations are no more secured in the absolute and uncontrollable enjoyment of their property and franchises, granted by the sovereign power, than are individuals, who are possessed of property and privileges, independent of legislative grants. By the Constitution of the State, Art. 1, § 21, "private property shall not be taken for public uses, without just compensation; nor unless the public exigencies require it." By the Constitution of the United States, Art. 5, of the amendments, "private property shall not be taken for public use, without just compensation." The right to take private property, for public uses, under the circumstances and conditions mentioned in the citations just made respectively, has been acted upon by the Legislatures of individual States and by Congress. Without such power, government would be embarrassed in a State or Nation like our own, where enterprize is attended in its operations with such great improvements

for the public good.   It is upon this very provision that rail-
roads are established ordinarily.   If this power was withheld,
corporations for such an object might proceed, if they could,
by contract, with individuals, acquire every thing essential to
the prosecution and completion of the work; but it is not
difficult to perceive that, in that case, obstacles would pro-
bably be presented, which would induce the corporation to
abandon its designs or submit to enormous and uncertain
exactions.   In the language of the Court, in one of the
citations from Gray's Reports, in reference to this subject,
"Whatever exists, which public necessity demands, may be
thus appropriated."   "Such appropriation is not regarded as
impairing the right of property, or the obligations of any
contract; on the contrary, it freely admits such right, and,
in all just governments, provision is made for an adequate
compensation which recognizes the owner's right.   Nor does
it appear to us to make any difference whether the land, or
other right, or interest thus appropriated, be derived directly
from the government or acquired otherwise, for the reasons
already stated, that it does not revoke the grant, or annul
or impair the contract, but recognizes and admits the validity
of both."   *West River Bridge* v. *Dix,* 6 How., 507; *Rich-
mond, Fredericksburg & Potomac Railroad* v. *Louisa Railroad,*
13 Haw., 83.

But, in the exercise of this power, it must appear distinctly,
"by clear and express terms, or by necessary implication,
leaving no doubt or uncertainty respecting the intent.   It
must also appear, by the Act, that they recognize the right of
private property, and mean to respect it, and, under our
Constitution, the Act conferring the power must be accom-
panied by just and constitutional provisions for full compen-
sation to be made to the owner.   In general, therefore, when
any Act seems to confer an authority to another to take
property, and the grant is not clear and explicit, and no
compensation is provided by it, for the owner or party whose
rights are injuriously affected, the law will conclude that it
was not the intent of the Legislature to exercise the right of

eminent domain, but simply to confer a right to do the act, or exercise the power given, on first obtaining the consent of those thus affected." 2 Gray, 1, before cited.

If the Legislature, having chartered a railroad or turnpike corporation, containing no provision that the Legislature may not confer similar privileges in another Act to others, and the same should be constructed and in operation, and it should subsequently pass another Act creating a body corporate, for the purpose of constructing and putting in operation a similar railroad or turnpike, which should have termini near those of the former, the object being to give additional facilities for communication from one terminus to the other, the proper power having adjudged it to be of common necessity and convenience, the second grant is no infringement of any constitutional right of the first, and it becomes effectual as a contract.

But if the Legislature, in granting the charter to the former corporation, restrained itself from conferring a similar privilege upon another corporation of the same kind, within a specified distance, the restriction would be binding, and could not be revoked, excepting under the high prerogative of sovereignty, and by making just compensation. This doctrine has been solemnly announced in this State, in *Moor* v. *Veazie*, 32 Maine, 343, and, in Massachusetts, in 2 Gray, 1, before referred to.

It is not contended by the counsel for the State, that the Legislature has undertaken to appropriate the property and the franchise of the Penobscot and Kennebec Railroad Company under the constitutional provision referred to; there is no indication of an intention to do so. But it has required of this company a duty, which is not *expressly* enjoined by the charter, and prescribing a fine for the omission to comply, thus making the omission a crime. If this provision is authorized under the power, which it is insisted the Legislature possess, the defendant must submit, though it does not appear that the liability arises from any abuse of the privileges and franchises by the charter granted. And it is not upon that

ground that the 5th and 6th sections of the law of 1858 is attempted to be sustained.

It is, however, contended, that the company being subject to a duty to receive, at all proper times and places, persons and articles and convey the same, &c., the Legislature, may properly take measures to see this duty fulfilled. The proper times for doing this service, must necessarily, be provided for by some rules and regulations, which shall be "prescribed and directed" in the language of the charter. Some persons or body of persons must do this, or it must remain undone. The directors, by the charter, alone are intrusted with this power. That they have abused this power, cannot be contended; for no objection whatever is made to the propriety of the rule, fixing the time of departure from the station at Kendall's mills. The Act of 1858 requires that trains shall wait beyond that hour, if the train of the crossing road do not arrive by that time. The place *where* the alleged omission of duty in the defendant occurred is in nowise the subject of complaint. The interference by the Legislature to modify the rules and regulations, touching the time of departure, is certainly in terms inconsistent with the power with which the directors are clothed in the 6th section of the charter. The rules and regulations were prescribed, upon this matter; they were complied with by the defendant, at the time in question. And some other power of the Legislature, than that existing in them by any reservation in the charter, must be found in order to hold him liable. If he had waited as required by the Act of 1858, and had thereby secured himself from the penalty affixed to the omission of that which is declared a crime, he must have been regarded by his employers as having neglected his duty to them, unless excused by some higher necessity. And if the statute of 1858 was not passed in obedience to this high necessity, it was the imposition of duties and obligations, and liabilities to punishment, for a neglect of those duties and obligations, additional to those required by the charter.

Was there any thing, in the relative position of the two

roads, crossing each other, or any duties arising therefrom, which authorized the legislative interference? The Somerset and Kennebec Railroad, not being connected with that of the Penobscot and Kennebec Railroad Company, further than that one crosses the other, it is not perceived that the latter have any duties, under the charter, to perform, arising from that fact, further than to take all precautionary measures, enjoined by statute, or otherwise, to prevent collision of the locomotives and trains generally on the two roads, or any interference with the other. The cars of one are under no obligation to go upon the road of the other; they do not, and from the construction of the roads, engines and cars, they cannot do so. If passengers or merchandize are offered at the places and times, when and where such are received, according to the rules and regulations of each respectively, they are to be taken and transported, whether they are brought or come to those places in one mode or another. The charter gives no power to require by the statute, that the train on one road shall wait for the train of the other, further than what safety demands, more than where such railroads having no connection with each other come in the same vicinity, without crossing.

In large cities, where numerous railroads centre, and where passengers and goods come thereto on one road, and go therefrom on another, both leading on the general course on which it is designed that the passengers and goods should proceed; and for the reason that the hours of departure of the trains of the latter are earlier than the hours of the arrival of the former, great inconvenience and loss may occur; but in a charter like that of the Penobscot and Kennebec Railroad Company, we do not perceive, in what way, according to the terms of the charter, the Legislature can prevent it by statute regulations.

But the ground on which the government's counsel principally rely, to sustain the 5th and 6th sections of the statute of 1858, is that the Legislature are vested with the power to establish rules and regulations for the safety and convenience

of all persons, by suitable statute provisions; and that this power is incidental to the general authority of this important branch of the government; that corporations, public and private, without any reservation, are subject to the exercise of this authority; that individuals are subject also to such restraints, by this power, as shall, in the judgment of the Legislature, be reasonable and conducive to the public good; and that private corporations, as they come into existence, with chartered rights and obligations, are not only bound to yield obedience to such statutes, which were in force at the time, but new provisions afterwards, looking to the same end, as police laws embrace such corporations, actually existing at the time, in the same manner as they do individuals; and that general railroad laws are of this character.

It is not denied, in behalf of the defendant, that the power contended for by the prosecuting officer of the State does actually exist in the Legislature, so far as it has reference to the safety of persons and property. But it is denied that the power exists, so that it can be exercised so far as to establish laws promotive of the *convenience* simply, of individuals, among themselves; and it is also denied that private corporations can be in any degree affected by laws passed by the Legislature, for the sole purpose of promoting the *convenience* of other private corporations, or the public generally, or any citizens or classes of citizens, in contravention of provisions in the charters of such private corporations respectively, unless it is by the constitutional provision of taking private property for public purposes, and upon compensation therefor.

With the Legislature, the maxim of the law, "*salus populi suprema lex,*" should not be disregarded. It is the great principle on which the statutes for the security of the people is based. It is the foundation of criminal law, in all governments of civilized countries, and other laws conducive to safety and consequent happiness of the people. This power has always been exercised by government, and its existence cannot be reasonably denied. How far the provisions of the

Legislature can extend, is always submitted to its discretion, provided its Acts do not go beyond the great principle of securing the public safety—and its duty, to provide for this public safety, within well defined limits and with discretion, is imperative. The principle is expressly recognized in the Constitution of this State, Art. 1, sections 1 and 20. All laws, for the protection of the lives, limbs, health and quiet of persons, and the security of all property within the State, fall within this general power of the government. The statute requirement, that the bell upon the engine of a railroad shall be rung as the train approaches a crossing of other roads; the placing of signboards, to warn persons who may be at or near a crossing; the erection of gates and bars, and the employment of persons to guard the crossings at the time of the passage of locomotives and cars; and of faithful and skilful brakemen upon the trains, and the coming to a stop at a specified distance of the place of the crossing of another railroad before crossing the same, and many others are examples of the exercise of this power of the government, through the Legislature. *Thorpe* v. *R. & B. R. R. Co.*, 27 Verm., 142.

Another class of cases has been the subject of legislation, under the power of the government to establish police regulations, and has been thought to be promotive of public *convenience*, rather than public safety. Such cases are when two parties have the right to do things similar to each other at the same time and place, and laws are properly made to prevent interference and interruption. This class of laws, which may be quite numerous, may be illustrated by what has been generally denominated the law of the road. Without any statute, or custom having the force of law, on the subject, difficulty might sometimes arise between travelers upon our highways. But when the subject is attentively considered, it will be found that such laws fall within the principle of promoting the public safety.

The counsel for the government has called our attention to many statutes and decisions which, it is contended, look more

to public convenience than to public safety; and, judging from the ability and the untiring diligence manifested in his argument, we cannot doubt that authorities favoring his views would be found, if they exist.   But we have been unable to discover in any of them the doctrine contended for, that legitimate police regulations will extend to matters conducive to the convenience of the public, when they conflict with the recognized rights of other parties.

It is not understood that the requirement contained, in the 5th section of the statute of 1858, is for the safety of the public, or for that of travelers upon railroads.   The delay demanded extends only to the space of twenty minutes; and if this delay was really essential to the safety of travelers concerned, the necessity of a greater delay will exist in full force.

It cannot be doubted that the Legislature, in the passage of this statute was influenced by a laudable desire, that the travel of passengers, who wished, at crossings of different railroads, to go from one to the other, should continue unbroken without any suspension; that it was not supposed that the safety of such travelers demanded the delay is made apparent by the title of the statute, which has reference to their convenience as well as their safety.

It is a well settled doctrine, that private corporations, without any express reservation of the powers over them in the Act of incorporation, by the Legislature, are subject, like individuals, to be restrained, limited and controlled in the exercise of powers granted, by such laws as the Legislature may pass, based upon the principle of safety to the public.   Whether, in the exercise of power by the Legislature, for the security of this object, it would be bound by an express reservation, we have no occasion to consider.   It may be that such a limitation of authority would be entirely nugatory, as a restraint upon the discharge of an imperious duty; but, of this, we give no opinion.

No reason is perceived for imposing upon private corporations, established from public necessity and convenience, more

onerous duties, in police regulations, than those to which individuals in the same condition are made subject. "The great object of an incorporation is to bestow the character and properties of an individuality on a collected and changing body of men." This is said by C. J. MARSHALL, in *Providence Bank* v. *Billings*, Pet. S. C. Rep., 514; and Redfield holds, "that, upon examination, this will be found to have placed the matter upon its true basis;" and, he adds, "as to the general liability to legislative control, it places natural persons and corporations upon the same ground." Redfield on Railways, 550, 551, 552, note.

If convenience to travelers on railroads will authorize the provisions under which this complaint is brought, it is not easy to perceive any limit to the power of the Legislature, in relation to its authority in matters of police. If travelers on railroads can invoke legislative aid for their convenience, the right can be extended to natural persons in all their operations, perhaps to the great inconvenience of other natural persons or corporations, who shall be made subject to such servitude. And, if such laws can be made effectual in direct violation of the provisions of a charter to a company, as a police regulation, there seems to be no good reason for withholding the exercise of the same power, where a natural person is concerned.

It is not believed that those who travel, or cause goods to be transported upon railroads, have a legal claim for the security of convenience, by statute laws, requiring duties of the proprietors of such roads, which duties are additional to those prescribed in their respective charters, and which the Legislature has precluded itself from imposing, which those, who undertake to travel in stage coaches, or have goods carried by common carriers for hire, have not.

But if railroads can be made subject to police regulation from which others are exempt, how far can this duty be extended? If the power exist to impose it in the slightest degree, we know of no line of limitation. It would certainly be convenient for the travelers living in a country thickly set-

tled with inhabitants, to be able to find stations where they can take passage within the shortest distances of each other; and have the train come to a stand against the dwelling of every one living near the railroad track, that he might be accommodated in taking his passage with greater convenience to himself, than it would be, if he were obliged to take another mode to reach a station. No one would probably contend that this should be done, and thereby subject the proprietors to burdens against which they were protected in the Act of incorporation, and if allowed, might be attended by ruinous results. Numerous examples might be mentioned showing the absurdity of the doctrine contended for on the ground of public convenience, which is often regarded as an argument quite as convincing as many others. For, if propositions will necessarily lead to absurd conclusions, they cannot be sound.

But from logical deductions of adjudged cases, which have been referred to, the doctrine that police regulations may be established by the Legislature for the convenience of the public, or travelers on railroads, cannot be upheld. It is not contended, or understood by the counsel for the State, in the imposition of duties under the police power, that it is taking private property for public use, and that, therefore, just compensation can be required therefor.

In the charter of the *Boston & Lowell Railroad Corporation* v. *The Salem & Lowell Railroad Company & als.*, 2 Gray, 1, it was provided that no other railroad, than the one granted, should, within thirty years from and after the passing of the Act, be authorized to be made, leading from Boston, Charlestown or Cambridge, to Lowell, constituted a contract, by the Commonwealth with the Boston and Lowell Railroad Corporation, that no other should be lawfully made for thirty years, and was within the constitutional powers of the Legislature to make, and was binding on their successors. The same principle was enunciated in the case of *Moor* v. *Veazie*, 34 Maine, 343, in which the exclusive right was conferred by the Legislature to navigate parts of the Penobscot

river by steamboats, in consideration of making improve-
ments in the same river, which were treated by the Legisla-
ture as being for public benefit.

In neither of these cases could the Legislature create a
new power to do the same thing, as that granted, consistently
with the contract already existing, although it might be for
public convenience that it should be done. And in the for-
mer of the two cases, just referred to, it was held that dis-
tinct railroads, of companies chartered afterwards, for other
purposes, could not form an union of their roads, by which
indirectly another road would exist within the limits pre-
scribed for the whole distance, and the object, which could
not be affected directly, thus in this mode attained.

This union, having in view the convenience of travelers on
railroads, might have been deemed within the police power
equally with that which we are now considering. But the
case contains no intimation that the contract could be avoided
in this manner.

But, as we have seen, if the sovereign power of the State,
acting through the Legislature, adjudged that the property,
the privileges and franchises of a private corporation could be
taken, because public necessity and convenience required it,
and thereupon create a new corporation for such a purpose,
the Act is void, unless provision is made by which just com-
pensation can be obtained. *But*, if chartered rights may be
impaired, and new duties imposed upon a corporation, with-
out compensation is effectually secured, with success, in con-
travention of stipulations in the charter, under the principle
that it is merely the exercise of the police power to promote
public convenience, it is a new and easy mode by which this
constitutional security of private property and privileges may
be broken down.

From the best consideration which we have been able to
give to the subject before us, and with a steady determina-
tion to sustain the action of a co-ordinate branch of the gov-
ernment, unless it clearly appeared beyond all substantial
doubt that it could not be done, we have come to the con-

clusion, that the provisions under which the complaint against the defendant was made were in violation of the rights secured to the Penobscot and Kennebec Railroad Company in their charter, and that they cannot be sustained on any of the grounds presented under the facts and the argument in behalf of the State.                    *Exceptions sustained.*
                    *Demurrer overruled; plea adjudged good.*

CUTTING, MAY, GOODENOW, DAVIS and KENT, JJ., concurred.