## The East Saginaw Manufacturing Co. v. The City of East Saginaw, et al.

*Power of a State Legislature to grant perpetual exemption from taxation : State bounties for the encouragement of manufactures.* If a State Legislature has power to enter into contract with individuals, forever exempting property from taxation, it will not be assumed that it has undertaken to do so in any case, unless the language employed is too plain to admit of doubt.

The offer of a bounty by a State, by way of encouraging manufactures, is subject to be recalled at any time, except as to so much as is already earned while the promise is a continuing one.

The State of Michigan passed an act to encourage the manufacture of salt. By one section a bounty of ten cents a bushel on salt manufactured within the State was promised, and in another all the property employed in the business was exempted from any species of taxation. Two years later the act was amended so as to limit the exemption from taxation to five years. When the five years expired, one of the corporations previously engaged in the business filed a bill in equity, to restrain the collection of a tax which had been assessed upon its property, claiming that the exemption was in the nature of a contract between the State and parties engaged in the manufacture, and was perpetual, and the State was prohibited by the Constitution of the United States from passing any law impairing its obligation :

*Held :* That the act first mentioned was in its nature and purpose only a bounty law and not a contract, that it might be repealed at any time, and the fact that injurious consequences might result to individuals from such repeal, was no more an impediment to legislative action, than would be similar results from general laws in any other case ; that if repealed, all that individuals who acted under it could claim, would be the money bounty on the salt actually made up to that time and the exemption from taxation to that time, but they could not claim that, for any purpose, the act should continue in force for their benefit in the future.

*Heard October 15. Decided October 26.*

Appeal in Chancery from Saginaw Circuit.

This was an injunction bill against the City of East Saginaw and Charles V. Deland, City Marshal, to prevent the collection of a tax levied by the municipal authorities upon the real estate of the complainant.

The bill states that the complainant is a corporation formed under the general mining and manufacturing law of Michigan, in April, 1859, for the purpose of manufacturing salt from salt water to be obtained in the State of Michigan; that prior to the year 1859, and until the fact was demonstrated by the experiment and expenditure of com-

plainant, it was not known that brine of sufficient strength
to profitably make salt existed in Michigan, but it had
been supposed that perhaps such brine might be found, and
the State had expended considerable sums of money from
1838 to 1842 to settle the question, but without any satis-
tory solution thereof; that the act to encourage the manu-
facture of salt, approved February 15, 1859, was passed to
induce individuals to make further experiments in that
direction; that a large amount of money was required to
make such experiments, which would have proved a total
loss in case of failure; that the risk was great, and that the
complainant was solely induced to take such risk by the
encouragement held out in said act; that in June, 1859,
the requisite buildings and machinery having been provided,
a well was commenced near the Saginaw River, and drilling
continued until the early part of 1860, when, at the depth
of 669 feet, brine was found; and the complainant, relying
upon said act, erected works and commenced the manufac-
ture of salt about the middle of the year 1860; and prior to
March 9, 1861, had actually manufactured 31,740 bushels
of salt; and complainant claims that its property used for
boring for and manufacturing salt is exempt from taxation,
and that the right to such exemption became and was
a vested right, which could not be taken away without its
consent; that all of complainant's property was purchased
and used for the purposes of said manufacture; that the city
of East Saginaw, in disregard of complainant's rights,
caused a tax to be levied upon its property, for the year
1867, amounting to $1,145 04, and that it is claimed that
said tax is a lien upon complainant's lands; and the bill is
filed for the purpose of removing the cloud thus raised on
complainant's title, and also for the purpose of having com-
plainant's right to such exemption from taxation established
and declared.

THE EAST SAGINAW MANUFACTURING CO. v. THE CITY
OF EAST SAGINAW ET AL.

The defendants appeared and answered, and a replication was filed. Afterwards, by stipulation, the answer was withdrawn, and a general demurrer was substituted; on which the cause was heard and a decree for a perpetual injunction was granted. The defendants appeal to this Court.

*W. L. Webber*, for complainant and appellee.

If the tax levied is illegal and void, there can be no question as to the complainant's right to relief, and the point to be settled on the law and the facts as stated in the bill is: Is this tax a legal and valid one ? As to this we make two points:

1. The tax is illegal and void as to complainant because at the time complainant was incorporated, and also when it became the owner of the property in question, the act under which it organized imposed a specific tax of one-half of one per cent. on its capital stock paid in, and money borrowed, which was in lieu of all State taxes, to be paid by the corporation. (*1 Comp. Laws, Sec. 1,819.*) In 1865 this section was changed by the Legislature so as to authorize a tax upon the property of such corporations upon the same principle as individuals are assessed and taxed. *Laws 1865, p. 23.* It was not legal to change the rate or principle of taxation as to complainant without its consent.—*Piqua Branch Bank v. Knoop, 16 How. 369; Dodge v. Woolsey, 18 How. 331.*

2. But the main point upon which the complainant relies, and upon which the Court is requested to pass, is the one specifically set out and claimed in the bill. By the act approved February 15, 1859, (*Laws of 1859, p. 551*), entitled "An act to encourage the manufacture of salt in the State of Michigan," the State, as complainant claims contracted with complainant that all its property, real and personal, used for the purpose of boring for and manufac-

THE EAST SAGINAW MANUFACTURING CO. v. THE CITY
OF EAST SAGINAW ET AL.

turing salt in this State, should be exempt from taxation, and complainant further claims that while the provision of the Constitution of the United States which prohibits a State from passing a law impairing the obligation of contracts remains in force, it is not in the power of the State to abrogate that contract. But it may be said : Here is no contract. Let us see. A State, being an organized association of individuals for governmental purposes, acts through its representatives, and may do any act which in the opinion of those representatives is for the general good of its inhabitants, unless such act is prohibited by the constitution.—*Sears v. Cottrell, 5 Mich. 251.*

The encouragement of manufactures has always been deemed a wise policy on the part of the Government, and particularly is this the case when the article is one of prime necessity, like that of salt. The history of the search for salt in this State proves that our people have always so regarded it.

The population of Michigan in 1860 was 749,113, showing consumption of 749,113 bushels of salt, equal to 149,822 barrels, which at two dollars per barrel gives $299,644, as the amount sent out of the State every year for salt. Certainly it is a gain to the State to have this money kept at home. In the manufacture of salt everything is kept at home. The nails to fasten the hoops on the barrels are the only imported articles. Every barrel made adds so much wealth to the State.

If a surplus be made and sold elsewhere, to that extent other States contribute to the wealth of this. We say then the Legislature could well afford to make a liberal offer to any who would incur the expense and take the risk of sinking experimental wells, and accordingly the offer contained in the said act of 1859 was made.

The complainant accepted the offer, incurred the expense at its own risk, and by its success has added vastly to the

wealth of the State; and, we may add, that the complainant was the only company or corporation that did accept the offer or make any expenditure in the Saginaw valley to that end, until after this complainant's efforts had proved successful. We say then here was contract. Here were parties competent to contract, the State being one party, the complainant the other. Here also was a subject fit to be contracted for. Here was a good and sufficient consideration and the contract was closed. A proposition made by the State accepted and acted upon by the complainant. This gives to the complainant a vested right to the exemption from taxation as promised in the act and claimed in the bill.

It is supposed by the defendant, that the act of March 15, 1861, (*Laws of 1861, p. 305*), engrafted a limitation upon the right, which has now expired, and that the right expires with the limitation. But if we are correct in saying that here was a contract which gave a vested right to the complainant, then it is not competent for the Legislature to affect the right.

On this point we shall call attention first to the fact, that in the act of 1859 there is no right of repeal or alteration reserved by the Legislature., The act is positive and unconditional.

We do not claim that this fact will prevent a repeal of the act, but that no subsequent repeal of the act will affect any rights acquired while the act is in force.

Puffendorf says, ( as cited in *Butler v. Palmer, 1 Hill, 335* ), " The law itself may be annulled by the author ; but the right acquired by virtue of that law whilst in force *must still remain."* See also,— *Commonwealth v. Essex Company, 13 Gray, 239, 253.*

We here call attention to the peculiar phraseology of the act of 1859, under which the complainant claims the exemption.

It is not an act of incorporation, but applies as well to

individuals as to corporations.—Sec. 1, provides, " That, all companies or corporations, *formed,* or that may be formed, for the purpose of boring for and manufacturing salt in this State, and any and all individuals engaged or to be engaged in such manufacture, shall be entitled to the benefits of the provisions of this act."

Now here is a general offer, open to all. Whether wise or unwise, provident or reckless, is not the question. The object to be obtained was to induce investment and experiment, without expense to the State in case of failure. The bare statement of the facts in the bill is stronger than argument. This solemn promise of the State is made and without condition or qualification. Parties invest their money in property on their faith in it, and use that property in this business. It is difficult to conceive of a more extreme case. Can this Court say that the Legislature in 1861 intended the change in the act to apply to property before that time acquired and then in use for the purpose mentioned ? The act of 1861 does not in express terms refer to property already in use for that purpose, and will be satisfied by making it apply to property to be thereafter put to that use. A retroactive effect will not be given to a statute, if its terms will admit of a different construction. On construction alone then complainant is entitled to the exemption; but were it otherwise, the right having vested, is protected by the Constitution of the United States.

In *Cooley on Const. Lim., p. 358* it is said that, " in its application as a shield of protection, the term 'vested rights' is not used in any narrow or technical sense, as importing a power of legal control merely, but rather as implying a vested interest which it is equitable the Government should recognize, and of which the individual cannot be deprived without injustice."

That complainant has the right to this exemption as

claimed, and that such right is protected we cite the following cases:—*Fletcher v. Peck,* 6 *Cranch,* 87 ; *New Jersey v. Wilson,* 7 *Cranch,* 164 ; *Dartmouth College v. Woodward,* 4 *Wheat.* 518 ; *Gordon v. Appeal Tax Court,* 3 *How.* 133 ; *Piqua Br. Bank v. Knoop,* 16 *How.* 369 ; *Ohio L. I. & T. Co. v. Debolt,* 16 *How.* 416, 432 ; *Dodge v. Woolsey,* 18 *How.* 331 ; *M. & T. Bank v. Debolt, 18 How. 381 ; Woodruff v. Trapnall,* 10 *How.* 190 ; *Jeff. Br. Bank v. Skelly,* 1 *Black,* 436 ; *McGee v. Mathis,* 4 *Wallace,* 143 ; *People v. Aud. General,* 9 *Mich.* 134 ; *People v. State Auditors,* 9 *Mich.* 327 ; *Osborne v. Humphrey,* 7 *Conn.* 336 ; *Butler v. Palmer,* 1 *Hill,* 324 ; *Derby Turnpike Co. v. Parks,* 10 *Conn.* 522 ; *People v. Platt,* 17 *Johns.* 195, 215 ; *Spooner v. McConnell,* 1 *McLean,* 337 ; *Hunsaker v. Wright,* 30 *Illinois,* 146 ; *Atwater v. Woodbridge,* 6 *Conn.* 223 ; *Matheny v. Golden,* 5 *Ohio State,* 361 ; *Slack v. M.& L. R. R. Co.,* 13 *B. Mon.* 1 ; *Montgomery v. Kasson,* 16 *Cal.* 189 ; *O'Donnel v. Bailey,* 24 *Miss.* 386 ; *Winter v. Jones,* 10 *Geo.* 190 ; *Bruce v. Schuyler,* 4 *Gilman,* 221 ; *Mich. St. Bank v. Hastings,* 1 *Doug.* 125.

There is no constitutional provision in Michigan prohibiting the exemption—it has been usual for the Legislature of this State to exempt such persons and property from taxation as in their judgment public policy, or the dictates of humanity required.

*B. J. Brown,* for defendants and appellants.

The question presented by the record involves this general inquiry, viz: *Did the second section of the act of 1859 create a contract, the obligation of which was impaired by its repeal?*

The question lies within narrow compass. It is not disputed that an agreement by a State for a consideration

received or supposed to be received, that certain property rights or franchises shall be exempt from taxation, or be taxed only at a certain agreed rate, is a contract protected by the Constitution; and that the grant of such franchise can no more be resumed by the Legislature, or its benefits be diminished or impaired without the consent of the grantees therein, than any other grant of property or valuable thing unless the right to do so is reserved by the charter itself.—*Cooley on Const. Lim. p. 279—280, and cases there cited.*

I repeat, that I do not dispute this " most stubborn and well settled doctrine of the common law." Nor is it necessary for my purpose to inquire whether, or not, there was an adequate consideration for the contract alleged. What I do maintain is this; that the right of the State to resume its sovereign power of taxation, was reserved in the charter of the East Saginaw Salt Manufacturing Company itself.

What constitutes the charter of the complainants? The act of 1859 merely? I apprehend not; but, rather to adopt the opening narrative of the bill, the complainant " is a corporation under and according to an act of the Legislature of the State of Michigan, entitled ' an act to authorize the formation of corporations for mining, smelting or manufacturing iron, copper, mineral-coal, silver or other ores or minerals, and for other manufacturing purposes,' approved February 5, 1853, and the acts supplementary thereto, and amendatory thereof." Its charter then is to be found in the act of 1853 read in connection with the act of 1859, and the other acts of the Legislature " supplementary thereto and amendatory thereof," including the act of 1861.

These acts are all public in their nature, and are to be regarded and construed as in *pari materia.—Patterson v. Winn, 11 Wheat. 385; Dubois v. McLean, 4 McLean, 489;*

*Rogers v. Bradshaw, 20 Johns. 735; Smiths Com. §639 et seq; W. & W. Turnpike Co. v. People, 9 Barb. 161; United Soc. v. Eagle Bank, 7 Conn. 457 et seq.; State of Indiana v. Eagle Township, 6 Ind. 83.*

There is another principle of construction germane to the point under consideration, and that is this: Where any doubt exists as to the rights of a private corporation under its charter, that doubt must be resolved in favor of the public.—*Lord Tenterden C. J.,* in *Stourbridge Canal Co. v. Wheeley, 2 B. & Ad. 793, E. C. R. 22; Barrett v. Stockton & Darlington Railway Co. 2 Scott. N. R. 370,* affirmed in error, *3 Scott N. R. 803;* and in the House of Lords, *8 Scott, N. R. 641; Grantham Canal Navigation Co. v. Hall, 14 M. & W. 880.* To the same effect are the remarks of Lord Eldon in the case of *Blakemore v. The Glamorganshire Navigation, 1 My. and K. 162.*

The American cases are numerous and equally decisive.

If it be true, that an ambiguity in a single statute, must operate against a corporation, claiming a right therefrom—it results as equally true, that a doubt whether two or more statutes are to be construed as in *pari materia,* will be solved by the same test.

I go further. I deny to one Legislature the right under our Constitution to abdicate the sovereign power of taxation in favor of a corporation, so that no succeeding Legislature can ever re-assume it.

Sec. 1 of Art. 15 of the Constitution is as follows: "Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes. All laws passed pursuant to this section may be altered, amended or repealed. "

What is an act of incorporation? It confers rights, franchises and privileges on the one hand, and imposes duties, liabilities and conditions upon the other. Will it be contended, that because the right is conferred by one act, and the condition

imposed by another, that they have therefore no connection?
Can the Legislature call into being the skeleton of a corporation by one act, and then by subsequent acts clothe it
with fat franchises which no power can thereafter strip off,
or take away?

At the time of the adoption of the Constitution, the
transactions between the State and a municipal corporation were well understood to be purely legislative in their
character. On the contrary such transactions in respect
to a private corporation might take on the form of a contract. Hence, the Constitution does not prohibit the creation of municipal corporations by special act—its plain and
manifest intent being to subject private corporations to
legislative control. If this be its intent, will the Legislature lightly be presumed to have violated it? If this be
its intent, will not the Courts uphold it? *McKay v. Detroit
& Erin P. R. Co. 2 Mich, 138 ;*

See *act of February 5, 1853;* §§ *25 26* § *20 of chap.
55 of the Revised Statues of 1846.*

Such are the cumulative provisions of the statutes upon
this subject.

I insist therefore that the charter of the complainant
itself, did contain a reservation by the Legislature of the
right "to alter or amend" it, and that such reservation
was not a condition repugnant to the grant, but a limitation of the grant, and its exercise in this case by the repeal of the act of 1859 was valid and constitutional, and
binding upon the complainant without its consent. *McLaren v. Pennington, 1 Paige, 102 ; Ogden v. Saunders, 12
Wheat. 213 ; Perrin v. Oliver, 1 Minn. 202 ; Roxbury v. B.
& P. R.R. Co, 6 Cush. 424 ; Mass. General Hospital v. State
M. L. Assurance Co., 4 Gray, 227 ; State v. Miller, 31 N.
J. Law, 521 ; State v. Mayor, &c, Id. 575 ; Commonwealth v. Fayette Co. R. R. Co., 55 Pa. St. 452 ; Bailey v.*

THE EAST SAGINAW MANUFACTURING CO. *v*. THE CITY
OF EAST SAGINAW ET AL.

*Hollister, 26 N. Y. 112 ; Matter of Reciprocity Bank, 17
How. Pr. R. 323.*

I am well aware that this power of the Legislature has
some limit, although as C. J. Shaw has said in the case
of Commonwealth v. Essex Company, it is difficult to de-
fine what that limit is. In my judgment, a careful review
of the authorities will lead to a qualification of the power
as follows:

1st. It cannot be exercised in respect to a matter solely
of individual advantage, but only in matters of public con-
cern.—*Milliman v. Oswego & Syracuse R. R. Co., 10 Barb. 87;
Zabriskie v. R. R. Co., 18 N. J. Eq, 178.*

2d. Where *under a power in a charter,* rights have
been acquired and become vested, no amendment or alter-
ation of the charter can take away the property or rights
which have become vested under a legitimate exercise of
the power so granted.— *C. J. Shaw,* in *Commonwealth v.
Essex Co., 13 Gray, 239.*

If it is urged as a corollary from this last proposition
that,

. 3d. If the State should make a grant of real or perso-
nal property, and the grant has been fully executed, and is
not continuing in its nature, it cannot afterward be
divested, I shall not stop to controvert it.

I claim this, and in the present case only this, that if
anything is reserved, the sovereign power of taxation
is so reserved, and upon this point the adjudged
cases hold no doubtful language.—*State v. Miller, 31 N.
J. Law, 521 ; State v. Mayor, Id. 575 ; Commonwealth v.
Fayette Co. R. R. Co., 55 Pa. St. 452 ; In matter of Oliver
Lee & Co.'s Bk., 21 N. Y. 19; Crease v. Babcock, 23 Pick. 342.*

If the act of 1861 was not a valid exercise of legislative
power, it follows that act No. 25, of the laws of 1865 is
alike invalid. The Legislature has no more power to change

the rate of taxation upon a corporation than it has to impose a tax upon its property theretofore exempt.

The National Banking act reserves to Congress the right to alter or amend it at pleasure.    No one has ever suggested that such amendment or alteration would impair the obligation of a contract.    We have heard something of late about keeping good faith with the banks, but the plenary control of Congress over these corporations is unquestioned and unquestionable.

There is an objection of a practical nature which I think is fatal to the bill.  It should have preceded the general argument of the case, but it appeared more convenient to defer its consideration to this place.  The bill avers that the complainant "has purchased and is using all its property" for the purpose of manufacturing salt; but it does not state when that purchase was made, nor even that it was made on the faith of the act of 1859.

The taxes which the decree of the Circuit Court enjoins are grouped together as an entire tax.    These taxes cover at least two distinct parcels of land, together containing seventy and ten one-hundredths acres.  Now, if any portion of that property was acquired after the act of 1861 went into force, then clearly no exemption can be claimed as to such property.

The bill should have stated distinctly and in terms that all the real estate described therein was purchased before the act of 1861 became operative.    The Court can indulge no presumption in favor of the complainant.  And aside from this ancient and reasonable axiom of equity pleading, the language of the bill, taken as a whole leaves no place for conjecture.  The fact is otherwise.    The demurrer was well taken for this reason alone, and the decree should be reversed and the bill dismissed.—*Conway v. Township Board of Waverly, 15 Mich. 257.*

COOLEY CH. J.

On the fifteenth day of February, 1859, the Legislature of this State passed the following act:

" SEC. 1.   The people of the State of Michigan enact: That all companies or corporations formed, or that may be formed, for the purpose of boring for and manufacturing salt in this State, and any and all individuals engaged or to be engaged in such manufacture shall be entitled to the benefits of the provisions of this act.

SEC. 2.   All property, real and personal, used for the purpose mentioned in the first section of this act, shall be exempt from taxation for any purpose.

SEC. 3.   There shall be paid from the Treasury of this State, as a bounty to any individual or company or corporation, the sum of ten cents for each and every bushel of salt manufactured by such individual, company or corporation, from water obtained by boring in this State: *Provided,* That no such bounty shall be paid until such individual, company or corporation, shall have at least five thousand bushels of salt manufactured."

On the fifteenth day of March, 1861, the foregoing act was amended as follows:   The first section, by adding a proviso limiting its benefits to those who should be actually engaged in such manufacture prior to the first day of August, 1861.   The second section by limiting the exemption from taxation to five years from the organization of the company or corporation.   And the third section, among other things, by limiting the bounty moneys that should be paid to any one individual, company or corporation, to the sum of one thousand dollars.

The East Saginaw Salt Manufacturing Company filed its bill in chancery in January, 1868, setting forth therein that its associates, in the month of April, 1859, became a corporation under the general law of the State authorizing the incorporation of companies for mining and manufacturing purposes; that in June of that year they commenced boring for salt near the Saginaw River in the

County of Saginaw, and continued their operations until early in the year 1860, when brine was found of sufficient strength and purity to warrant the company to proceed in the manufacture of salt; that relying in good faith upon the benefits promised in said act of 1859, the complainant proceeded at once to·erect works for such manufacture, and to enter upon that business, and by the ninth day of March, 1861, had actually manufactured from the water of said well six thousand three hundred and forty-eight barrels of salt, each containing five bushels; and that in consequence of the facts above stated, the property of complainant used for the purpose of boring for and manufacturing salt is exempt from taxation, and the right to such exemption is a vested right, which it is not competent for the Legislature to take away without complainant's assent.

The bill further avers that complainant is still engaged in the manufacture of salt at the place aforesaid, and is employing all its property for the purpose; that it is the owner of certain real estate particularly described in the bill, of the value of $20,000; that such real estate is situate within the city of East Saginaw, and that the authorities have levied a tax upon the same for the year 1867, amounting to the sum of eleven hundred and forty-five dollars and four cents, which is a cloud upon the title of complainant, and which the City Marshal threatens to proceed to collect. And the bill prays a perpetual injunction against such city and the City Marshal, to restrain the collection. To this bill there was a demurrer, and the questions before us are those the demurrer presents.

It will be seen from this brief abstract of the bill that it is not claimed by complainant that the particular property on which the tax in question was levied was purchased in reliance upon the act of 1859, or that the same or any part thereof was employed in the manufacture of

salt, or was owned by complainant previous to the amendatory act of 1861. The claim of the bill appears to be this: The complainant engaged in the manufacture of salt while the act of 1859 was in force, and had produced sufficient to earn a money bounty under that act before its amendment; it thereby acquired a vested right which the Legislature could neither take away nor abridge, to have all the property of this corporation employed in this business perpetually exempt from taxation for any purpose whatsoever. On any claim less broad than this, it is evident the present bill could not be sustained.

It cannot fail to strike the mind when this claim is put forth, that the most serious and alarming consequences may flow from it, should it receive the sanction of the courts. The demand of exemption is made under that clause of the Constitution of the United States which forbids the States to pass any laws violating the obligation of contracts; and the argument is, that the corporation, by accepting the offer which the State made to those who should engage in the development of its resources, in salt, and by actually obtaining a productive well, has thereby entered into a contract with the State, by which, in consideration of continued manufacture, the State for all time so ties up its hands as to preclude the exercise of the power of taxation in regard to all property which complainant may employ in the business.

Now, it has been too often remarked by the Courts to render it important for us to enlarge upon it here, that the power of taxation is one of the essential powers of sovereignty, which the State must exercise again and again, as often as its needs or its interests may require; and one that cannot in the least be crippled or abridged, without to that extent crippling the State, impairing its vitality, and in some degree endangering its existence. It is upon this ground that it has been so often and so earnestly denied

19 mich.—12.

by learned and able jurists, that it is within the grant of
authority to any legislative body, chosen as representatives
of the people, to enter into any contract, by which they
bargain away any portion of the power to levy taxes for
the needs of government.    For the representatives of the
people do not receive the powers of government for any
purposes of sale or grant, but they take them in trust for a
brief period, to be employed for the general welfare, within
such limits as the people may have prescribed, and under
obligations to transmit them unimpaired to their successors.

It may not be unimportant to examine somewhat more in
detail the consequences that may fairly be anticipated from
accepting the position which is taken by the complainant
in this case.    The act of 1859, it will be perceived, is not
in express terms made perpetual, nor do we discover in it
any words which indicate a legislative intent that it shall
be irrepealable.    It is perpetual in the same sense in which
all statutes are, which prescribe a rule of action without
limiting the term of its continuance; but it is neither
necessary nor usual to reserve the right of repeal in order
that the Legislature may possess full power to do so, and
complete authority to abolish the rule whenever the vary-
ing interests of the State shall appear to that body to
render such action important.    The absence of any express
reservation of the right to repeal, or of any limitation in
time, is not therefore a fact of any significance in this
connection, since in this particular the statute is not unlike
the ordinary legislation of the State, in regard to which
the idea of contract between the State and the people
whose interests it affects is never suggested.

The act of 1859 is clearly, in its nature and purpose, a
bounty law and nothing else.    For the encouragement of
the manufacture of salt, it promises an exemption from
taxation, and the payment of a sum of money for each

bushel of salt produced after the quantity shall have reached a certain prescribed limit. When a bounty is earned, it becomes a vested right, and we fully agree with the former decision of this Court in *People v. Board of State Auditors, 9 Mich., 327,* that the party earning it cannot then be deprived of the right. But when is a bounty earned? Not, certainly, as soon as the party has made his arrangements for earning it. He may have abandoned some other business with that object in view; he may have made large investments in preparation for accepting the condition of the proffered bounty; the changes he makes in his affairs, in reliance upon the promise of the State, may be so great as to expose him to ruin if the offer be withdrawn, but until the condition is fully performed, no one will pretend that the State may not withdraw the offer, and expose his interests to these serious consequences. Whatever there may be in his case to render the withdrawal inequitable and unjust, may appeal with more or less force to the Legislature against so harsh a measure, but the equity of his case will not constitute a legal impediment to the legislative action. Like all other citizens who make their arrangements in reliance upon the continued existence of the laws as they are, he takes upon himself the risk of their being changed, and the State incurs no responsibility in consequence of the change proving injurious to his private interests. — *Charles River Bridge v. Warren Bridge, 11 Pet. 420; Turnpike Co. v. State, 3 Wal. 210; Piscataqua Bridge v. New Hampshire Bridge, 7 N. H. 35; Goshen v. Richmond, 4 Allen, 460; Bridgewater v. Plymouth, 97 Mass. 390.*

The money bounty on each bushel of salt above the required quantity, was earned when that bushel was made, and not before. The repeal of the bounty law, therefore, absolves the State from all legal obligation to pay the

bounty upon any that shall be manufactured afterwards.
The fact that large investments will thereby be rendered
unproductive, cannot preclude the repeal. We are not aware
that this position has ever been disputed, though the money
bounty was long ago wholly discontinued, and this corpora-
tion has ever since been largely interested to dispute the
right of the State to stop it, if to do so, could be of any
avail.

The bounty that is to be given by way of exemption
from taxation does not, so far as we can discover, rest upon
any different basis. The State promises not to tax; but this
means only that it will not tax so long as the promise is a
continuing one, and the condition on which it is made is
performed. Those who pursue the manufacture until the
promise is recalled, have earned the exemption to that time,
but they have earned nothing more. For protection against
loss from its recall, they must appeal to the generosity of
the Legislature, and its sense of right and justice.

If this be not so, then the early repeal of the bounty
law has alone saved the State from having all the property
employed in one of its most extensive manufactures forever
exempted from all the burdens which every other business
must bear in the support of the government and the preserva-
tion of public order. But the evil might not stop here
and would be very certain not to do so. The people of
this State at the present time are being pressed with argu-
ments to demonstrate the necessity of railroad improve-
ments, and the great and urgent importance of individuals
and communities lending them their aid. There are not
wanting plausible arguments in favor of exempting all such
improvements from State and local taxation, in considera-
tion of the benefits they confer upon the State, in extend-
ing settlement, enhancing the value of lands, and increas-
ing the facilities for commerce and travel. So great a boon

as a perpetual exemption from taxation, is one for which this interest might afford to labor earnestly and persistently, and if the incidents of an irrepealable contract can be discovered in the law before us, he would be no vain alarmist who should confidently predict the speedy coming of the time, when millions of property of this description would be found forever exempt from taxation, under improvident and hasty legislation, passed under the specious pretense of encouraging struggling enterprise.

Railroads, however, are not the only investments that appeal to the fostering care of our citizens. There are many among us who think all that is necessary to render the State wealthy and prosperous is to introduce extensive manufactures, so that the raw material we produce shall be worked up at our doors. There are others who think that the great need of the State is people to penetrate its forests, and bring its wild lands under cultivation. There are still others who believe the mining interests require special attention and encouragement. It is not too much to suppose that sometimes the one view and sometimes the other will be paramount in the Legislature, and influence the levying of taxes. And if one class after another can secure a perpetual exemption from taxation, on the pretense of necessary encouragement, in the periods of uncertainty and embarrassment, we might at length have the leading interests of the State enjoying the benefits of protection and government, while the other members of community are compelled to bear its burdens.

Nor is it very apparent that the citizen who engages in banking when the law imposes a specific tax on the capital employed in that business, may not with equal reason claim that the State contracts with him never to increase that tax. He makes his arrangements and investments in view of what the law then is, and it may be quite as inequitable, and quite as pregnant of injurious

consequences, to increase the rate of taxation, so as possibly to render his business unprofitable, as it was to repeal the proffered bounty in the present case. The circumstances may appeal to the justice of the Legislature with equal force. Church organizations and literary institutions and societies, whose property is now exempt from taxation, might claim perpetual exemption in still closer analogy to the present case; for it cannot be disputed that their exemption is granted in order to encourage religion and learning, and has for its object the general welfare, as much as the bounty which was held out as an inducement to the manufacture of salt. Lands are purchased and buildings erected in reliance upon the exemption, and reasonable expectations are disappointed when it is taken away. There are all the circumstances necessary to constitute a contract with the State in such a case, if one can exist in the one before us. In this connection we refer to what it is said in *Brainard v. Colchester, 31 Conn, 409,* with full approval.

In questioning the act of 1859, in order to determine whether the exemption it promises is perpetual or not, we must not forget that the promise and obligation, whatever it is, is on the side of the State only. Those who accept the bounty promise nothing, and bind themselves to nothing. However much it may be for the interest of the State that they should continue in the manufacture, they are not obliged to do so, but may abandon it at any time. Their acceptance, therefore, is only during their own good pleasure, and while they shall continue to find it for their interest. This fact alone, if this were merely an ordinary contract between man and man, would go far to raise very serious doubts whether it was intended to be an arrangement more permanent than at the will of either party, and whether one had not the same right to terminate it

at any time, which was possessed without question, by the other.

Nor, on the question of proper construction, must we fail to bear in mind what the subject of the statute was. It respected the taxing power of the State, and is claimed to constitute an agreement not to employ it in a certain class of cases for all future time. To use the words of Mr. Justice Campbell in *Christ Church v. Philadelphia, 24 How., 302*, in speaking of a law exempting property from taxation : It " belongs to a class of statutes in which the narrowest meaning is to be taken which will fairly carry out the intent of the Legislature. All laws, all political institutions, are dispositions for the future, and their professed object is to afford a steady and permanent security to the interests of society." But they do not, therefore, as he very clearly points out, become irrepealable laws. Chief Justice Marshall has said, in speaking of the taxing power, that as the whole community is interested in retaining it undiminished, its abandonment ought not to be presumed in a case in which the deliberate purpose to abandon it does not appear. *Providence Bank v. Billings, 4 Pet., 561.* The Supreme Court of Pennsylvania adopted the same rule of construction when they declared that if such an exemption from taxation exists, " it must be the result of a deliberate intention to relinquish this prerogative of sovereignty, distinctly manifested." *Easton Bank v. The Commonwealth, 10 Penn. St., 450.* To the same effect are *People v. Mayor, etc., of New York, 32 Barb., 113 ; Illinois and Mich. Canal v. C. & R. I. R. Co., 14 Ill., 321.* We also quote from the opinion of Mr. Justice Swayne in the case of *Gilman v. Sheboygan, 2 Black, 513.* " The imposition, modification, and removal of taxes," he says, " and the exemption of property from such burdens, is an ordinary exercise of the power of State sovereignty. There is no pledge, expressed or implied, that this power

should not thereafter be exercised.  Admitting that the
State *could* enter into such an engagement, there is no
evidence ( in the case at bar ) that it did.   This fact
should never be assumed unless the language used be too
clear to admit of doubt."   " Too plain to be mistaken," are
the words of Chief Justice Taney in speaking on the same
subject in *Ohio L. Ins. & T. Co., v. Debolt, 16 How., 435.*  Such
a rule of construction is eminently wise and reasonable, and
if a different rule prevailed, and every careless and every
corrupt act of legislation which scheming individuals or
powerful interests might secure in their own favor, were to
be instantaneously clothed with the attributes of contracts
of an irrepealable character by virtue of the Constitution of
the United States, and thus acquire a force and perma-
nence which the Parliament of England, with all its
boasted omnipotence, could never give to its acts; and if
the courts, whether it accorded with their sense of right
and justice or not, were then compelled to encourage such
legislation by enforcing it, in defiance of the law-making
power itself, in favor of those who had been artful enough
to secure it; the question might be presented in the most
serious and forcible aspect to the American people, whether
the clause of their national Constitution inhibiting the vio-
lation of the obligation of contracts, was not, as expounded
and enforced, productive of more evil, injustice and corrup-
tion, than could reasonably be anticipated from leaving the
legislatures of the States as much untrammelled in this
particular, as are the legislative bodies of free States gen-
erally.

We are aware that it is not usually a logical mode of
argument to endeavor to demonstrate the non-existence of
a power by pointing out its liability to abuse; but in
questions relating to sovereign powers, it has often been
recognized as both legitimate and cogent.  Chief Justice
Marshall, in the leading case of *McCulloch v. Maryland, 4*

THE EAST SAGINAW MANUFACTURING CO. *v.* THE CITY
OF EAST SAGINAW ET AL.

*Wheat., 316,* rested his argument against the power of the
States to tax the agencies of the general government, to a
considerable extent upon the illimitable nature of this
power where it existed, and the possibility that the States,
if they could tax the 'agencies of the general govern-
ment at all, might so exercise that authority as practi-
cally to annihilate them, and thus endanger the existence
and perpetuity of the Union itself. He wholly repudiated
the idea that confidence in the good faith of the State
governments must forbid our indulging the anticipation of
such consequences. Similar considerations have led the
State courts to deny to the General Government the
power to tax the instruments through which the State
sovereignty is exercised.— *Warren v. Paul, 22 Ind. 279;
Jones v. Keep's Estate, 19 Wis. 369 ; Fifield v. Close,
15 Mich. 505; Union Bank v. Hill, 3 Coldw. 325 ; Smith
v. Short, 40 Ala. 385 ;* and we are not aware that the
proper authorities of the General Government have ever
questioned the correctness of these decisions, and taken the
necessary steps to secure their review. In those cases in
which the power of a State by contract to abridge or
restrict any of the essential powers of sovereignty, has been
denied or questioned, stress has been laid upon the great
and imminent liability to abuse if the power exists at all.
—*Brewster v. Hough, 10 N. H. 143 ; Piscataqua Bridge
v. N. H. Bridge, 7 N. H. 69 ; Backus v. Lebanon, 11 N.
H. 24; Mechanics and Trader's Bank v. Debolt, 1 Ohio
N. S. 594; Toledo Bank v. Bond, Ibid, 622 ; Knoup v.
Piqua Bank, Ibid, 603 ; M. & R. Plank Road Co. v.
Husted, 3 Ohio N. S. 578; Thorpe v. R. & B. R. R. Co.
27 Vt. 140 ; Brainard v. Colchester, 31 Conn. 410 ; Mott
v. Penn R. R. Co. 30 Penn. St. 9.* Upon the like consid-
erations it is now held that although a State grants a
privilege in exclusive terms, it does not thereby bind its
hands against such an exercise of the right of eminent

19 MICH.—J².

domain as may annihilate the franchise for the benefit of
another which the terms of the first would exclude.— *West
River Bridge Co. v. Dix*, 16 Vt. 446 ; s. c. in error, 6
How. 507 ; *Enfield Toll Bridge Co. v. Hartford and N. H.
R. R. Co.* 17 Conn. 40 and 454 ; *Matter of Kerr, 42
Barb. 119.* We refer also to the cases in which the right to
exercise the police power, has been asserted, notwithstanding
grants, inconsistent therewith. —*Brick Church v. Mayor, etc.,
of N. Y. 5 Cow. 538 ; Vanderbilt v. Adams, 7 Cow. 349 ;
Thorpe v. R. & B. R. R. Co. 27 Vt. 149; Indianapolis, etc.,
R. R. Co. v. Kercheval, 16 Ind. 84; Ohio, etc., R. R. Co.
v. McClelland, 25 Ill. 140 ; State v. Noyes, 47 Me. 189;
Hirn v. State, 1 Ohio N. S. 15 ; Calder v. Kurby, 5
Gray, 597 ; Adams v. Hacket, 7 Fost. 294.*

It is said, however, that the doctrine of some of these
cases is opposed to that declared by the Supreme Court of
the United States, which, upon all questions arising under
the Constitution of the United States, must be the final
and authoritative arbiter.    Some of the cases decided by
that court are specially referred to as having finally and in
the most conclusive manner settled the questions before us
in the case at bar.    We have looked into those cases, how-
ever, without finding in any of them  anything to weaken
the positions we have already assumed.    It is· not very clear
that the Supreme Court of the United States has ever, at
any time, expressly declared the right of a State to grant
away the sovereign power of taxation.    The leading case of
*New Jersey v. Wilson,* 7 *Cranch, 164,* may well be referred
to an excise of the treaty-making power, and therefore rests
upon different considerations from those which surround
the ordinary exercise of legislative authority.    There are
indeed several cases in which it has been held that a State
may irrevocably limit itself to a particular rate of taxation
only.—*Gordon v. Appeal Tax Court, 3 How. 133 ; Piqua
Bank v. Knoup, 16 How. 369 ; Ohio L. & T. Company*

*v. Debolt, Ibid, 416; Dodge v. Woolsey, 18 How. 331; M
& T. Bank v. Debolt, Ibid, 380 ; M. & T. Bank v Thomas,
Ibid, 384.* It is to be observed of all of these cases, how-
ever, that the exemption which the Court sustained did not
rest upon any mere implication to be derived from an
ordinary act of legislation, but was express in its terms,
and was embodied in charter contracts so as to be sup-
posed irrevocable under the principles announced in the
Dartmouth College case. The counsel for this complain-
ant has expressly disclaimed the suggestion that the act
of 1859 can be regarded as an amendment of complainant's
charter, or that the rights of complainant rest upon any
other or different basis from those of any individual who
may have commenced the manufacture of salt before the
bounty law was amended. There is, therefore, no question
of the inviolability of charter contracts before us. More-
over, in considering the Bank-tax cases above referred to, it
must be borne in mind that the stipulations there involved
were not for complete exemption from taxation, but for
restriction to a particular mode and rate only. It is easy
to perceive that there may be a difference in principle
between a complete exemption from a necessary burden of
government, and an agreement that the burden shall be laid
and borne in a particular manner only. Mr. Justice
McLean has hinted at this distinction in *Piqua Bank v.
Knoup, 16 How. 389.* Referring to the argument that the
State cannot barter away any part of its sovereignty, he
says: "No one ever contended that it could. A State, in
granting privileges to a bank, with a view of affording a
sound currency, or of advancing any policy connected with
the public interest, exercises its sovereignty, and for a public
purpose, of which it is the exclusive judge. Under such
circumstances a contract made for a specific tax, as in the
case before us, is binding. This tax continues, although all
other banks should be exempted from taxation. Having

the power to make the contract, and rights becoming
vested under it, it can no more be disregarded nor set
aside by a subsequent Legislature than a grant for land.
This act, so far from parting with any portion of sover-
eignty, is an exercise of it. Can any one deny this power
to the Legislature? Has it not a right to select the objects
of taxation and determine the amount? To deny either of
these is to take away State sovereignty."

It might not be improper to refer to still more sig-
nificant remarks by the dissenting judges in the case last
referred to, but that we desire to preclude the possibility
of our opinion being thought to imply the impugning in
any degree the correctness of the views of the majority of
the Court in the Bank-tax cases in 16th and 18th Howard.
The case before us does not bring them into controversy,
and if it did, we should of course accept them as con-
clusive. The present case stands upon a different footing
altogether. There is no charter contract involved here,
and no stipulation by way of commutation for a tax. The
case, nakedly stated, is one where an offered bounty is
sought to be raised by the force of mere implications to
the dignity of an irrevocable contract. When the Courts
are asked to enforce the offer as a contract, they are
asked to give to the legislative act a meaning and a
purpose which was never within the contemplation of
the men who passed it. We cannot make contracts for
persons or for States who never contemplated them them-
selves. If a State Legislature possesses the power to
implant the seeds of dissolution in the body politic, by
granting away the right of taxation by way of bounties,
we are not to be astute in discovering an intent to do so
in the general language employed in what appears to be an
ordinary act of legislation. On this subject we refer further
to *Herrick v. Randolph, 13 Vt. 531; Commonwealth v.
Bird, 12 Mass. 442, and Dale v. The Governor, 3 Stew.*

*387*, in all of which an exemption from a public burden in general terms like the present was held not to be perpetual, but during the pleasure of the Legislature only.   We also refer to what is said in *Charles River Bridge v. Warren Bridge, 11 Pet. 544.*

It may be proper in this connection to notice one other case which is pressed upon us as analogous to the present. In *McGee v. Mathis, 4 Wal. 143*, it appeared that swamp lands had been granted by the United States to the State of Arkansas, the proceeds of which, by the terms of the grant, were to be applied to the drainage of the lands.   The State, in order to promote their drainage and sale, passed an act by way of encouraging purchasers, that the lands should be exempt from taxation for the term of ten years, and issued transferable scrip receivable in payment for them.   A repeal of the act so as to affect either the land sold or the scrip previously issued, was held unconstitutional.   We do not doubt, in the least, the correctness of this decision.   The legislative act was a step in performance of the condition attached to the Congressional grant, and the lands had never become a part of the taxable property of the State except subject to the performance of the condition.   To hold that the State could take the lands, sell them as a means of performing the condition, and then claim an indefeasible right to tax them under such circumstances as would amount to a repudiation of the condition, would be to take broader positions than any which have been advanced in any of the cases we have cited.   We discover no analogy between that case and the one before us.

We do not deem it necessary for us to go beyond the decisions of the Supreme Court of the United States to find authority for sustaining this tax.   The case of *Christ Church v. Philadelphia, 24 How. 300,* is in our opinion entirely analogous in its legal bearings to the present case. It there appeared that the Legislature of Pennsylvania in

1833 had provided by special act that "The real property, including ground rents, now belonging and payable to Christ Church Hospital in the city of Philadelphia, so long as the same shall continue to belong to the said hospital, shall be and remain free from taxes." The inducement to this legislation was stated in the same act to be, the corporation "having for many years afforded an asylum to numerous poor and distressed widows, who would probably else have become a public charge;" and it being represented that "in consequence of the decay of the buildings of the hospital estate and the increasing burden of taxes, its means are curtailed and its usefulness limited." Notwithstanding the words of perpetuity employed in the act, the Legislature, some eighteen years afterwards, took away the exemption as to some portion of the property, and were sustained by the Supreme Court of the State in so doing. On error to the Supreme Court of the United States, the judgment was affirmed. Mr. Justice Campbell, delivering the opinion of the Court, says: "The inducements that moved the Legislature to concede the favor contained in the act of 1833 are special, and were probably temporary in their operation. The usefulness of the corporation had been curtailed in consequence of the decay of their buildings and the burden of taxes. It may be supposed that in eighteen years the buildings would be renovated, and that the corporation would be able afterwards to sustain some share of the taxation of the State. The act of 1851 embodies the sense of the Legislature to that effect. It is in the nature of such a privilege as the act of 1833 confers, that it exists from *bene placitum*, and may be revoked at the pleasure of the sovereign."

Now, although in that case the purpose of the act was not distinctly declared to be to induce the corporation to expend moneys in the way of improvements, yet it is evident that such expenditure was not only within the contem-

plation of the Legislature, but it was also expected that the public would in the future receive a benefit from the improvements, as it had already from the buildings which had gone to decay. The purpose of the act was therefore to encourage an expenditure for a public purpose; which is all that can be urged in favor of the inviolability of the act now in question. We say here in the language of Mr. Justice Campbell. above quoted, that the inducements to the act of 1859 were special and temporary in their operation; and it may well be supposed that at ·the expiration of the time limited by the act of 1861, the persons engaged in the manufacture of salt would have surmounted the difficulties attending the establishment of a new business, and become able to sustain some share of the taxation of the State. The act of 1861 embodies the sense of the Legislature to this effect.

This review leads us irresistibly to the conclusion that there is nothing in principle, and nothing in the adjudged cases, which requires us to hold that the act ˙of 1859 constituted a contract between the State and those who, before its amendment, accepted the bounty it offered. We are also satisfied that, to form such a contract, was never the legislative intention. And upon formal grounds, also, we think the complainant must fail, because the bill does not affirmatively show that the property upon which the tax was levied belonged to complainant and was employed in the. manufacture of salt before the promise of bounty was recalled. It is consistent with all its allegations that the corporation may have become the owner of · this property, not only after the act of 1861 was passed, but after the five years specified in that act had expired. And if such were the case it would be idle to pretend that the investment was made in reliance upon the act of 1859.

The decree of the Court of Chancery we think, was

erroneous, and it must be reversed, and the bill dismissed, with costs of both courts.

CHRISTIANCY and GRAVES JJ. concurred.

CAMPBELL J.

The principal question in this case is, what was the nature of the promise or offer of the State in regard to exemption from taxes of property invested in the manufacture of salt.

The act in question, passed in 1859, is entitled "*An act to encourage the manufacture of salt in the State of Michigan.*" It contains two distinct inducements to engage in boring for and manufacturing salt. The first is a stipulation that "*all property real and personal, used for the purposes mentioned in the first section of this act, shall be exempt from taxation for all purposes.*" The second is an offer to pay from the treasury a bounty of ten cents per bushel to any individual or company making as much as 5,000 bushels of salt from water obtained by boring in this State. The act of 1861 was an amendment of this act, and changed it, by confining its operations to those who should have been actually engaged in the manufacture prior to August 1861; by confining the tax exemption to five years from the organization of any company or corporation; and by changing the limitations of quantity and confining bounties to salt manufactured from the salt wells of the makers themselves, the original act not having confined it to that.

Whatever these various offers in 1859 may have meant, there can be no doubt that so long as they remained unrevoked, every acceptance of them formed a contract which could not lawfully be repudiated. It is equally plain that the offers could be lawfully withdrawn at any time without furnishing any ground of complaint to those who had not acted on them.

We have already held that so long as the salt bounty
was not revoked, every bushel of salt manufactured in ac-
cordance with the terms of the law, entitled the maker to
his reward; and that the manufacture of each bushel was
a several and independent contract whereby the State and
the manufacturer became bound together by a valid agree-
ment. *People v. State Auditors, 9 Mich. R., 327.* The ma-
ker could cease to make at his pleasure, and the State
could withdraw its offer when it saw fit. In either case
there would be no further contracting between those par-
ties.

The offer to exempt from taxation was also an offer
which could be withdrawn as to everything not done in ac-
ceptance of it, but it was, like the bounty offer, binding
when accepted according to its terms. The exemption was
purchased at the price the State saw fit to put upon it,
and the bargain must stand according to its real tenor.

The exemption was offered in favor of all property used
for the purposes of the law. It attached, therefore, to each
structure for that purpose as soon as made, and to each
parcel of land as soon as so applied. The use purchased
the privilege. And we have only to inquire whether that
privilege was or was not revocable. It was not for any
specific period, and was therefore either permanent or en-
tirely under State control. If revocable at all, it was revo-
cable at pleasure. There is no middle ground to be dis-
covered for this promise. It could have been revoked when
all the expenditure had been made and before any profita-
ble result had been reached, as well as afterwards. And
an agreement to do as one pleases, is no agreement in law
whatever. That is no promise, the performance of which is
optional. Put in plain English, the law, with this inter-
pretation, is equivalent to a statement to capitalists that if
they will invest and use their property in developing the
new and important interest referred to, the State will keep

them free from taxation until it sees fit to tax them. It is idle to call any such delusive proposition a promise or a contract, and the law was certainly designed to give some valuable reward to enterprise.

The only meaning which can give any effect whatever to this statute, is that which makes this exemption absolute for some time or other. And where it is promised absolutely, and without limitation of time, it can only be made effective by regarding it as permanent until changed by both parties.

There is nothing to prevent a State from discontinuing at any time, such exemptions as are not agreed upon, but merely gratuitous benefits, not offered on any consideration. Where exemptions are found in tax laws, they are usually nothing more than directions to the tax officers, and not undertakings with anybody. The distinction was referred to in the *Ohio Bank-tax cases* and has been often recognized. In the case of *Christ Church v. the County of Philadelphia, 24 How., 300,* the right of the Legislature to make permanent exemptions from taxation is expressly stated not to have been disputed, but the whole argument of Court and counsel rested on the want of consideration, and the intent to make a spontaneous concession, without any corresponding service. The statute in its preamble, referred entirely to past charities and losses, as the occasion of its passage.

In the present case, the inducement of exemption to property used for the purposes of the statute, contemplated experiments which must inevitably be costly, and, in case of finding brine, further investments, requiring the occupation of large lots of land, and the preparation of vats and boileries, which would be useless for any other purpose. It was the clearly expressed opinion of that Legislature that the developement of such an enterprise would add to the wealth of the State enough to balance any imaginary loss from taxes

which might never have been earned except for this encouragement. And it is plain that such business could never increase enough to make the property invested assessable at any large sum, without adding quite as much to the assessable value of other property in the State not so invested, and therefore not exempted. If the enterprise failed, the property would cease to be so used, and would become taxable. If it succeeded, the State, by ordinary business experience, would be no loser. And, having the power at any time to withdraw the proffer from any future investments, there was no very serious danger that any considerable section of the state would be expunged from the tax rolls.

Whether they judged rightly or wrongly, therefore, the Legislature of 1859 deliberately fixed their own price for the privileges they offered, and it would be neither just nor reasonable to attribute to them the dishonesty of making a fraudulent offer, or the folly of supposing that any capital would be invested on any inducement, short of what was supposed to be a binding promise of some sort.

If they had the power to make this exemption, then there is no more reason to attempt to evade it, than to avoid enforcing any other contract. It no more hampers the sovereign power to make a permanent that a temporary contract of exemption. An exemption of ten years differs only in degree and not in kind from a perpetual exemption. And a permanent exemption to a corporation created under our general laws is only for thirty years at most. And the judicious exemption of property likely to aid the public welfare and increase the general wealth is cheaper and more profitable than the expenditure of public money for such purposes. The money squandered after taxes have been laid and collected, will, unless communities are very fortunate, very much exceed any imaginable loss by exemptions.

I think the fears expressed by some Courts that these
exemptions will be carried so far as to drain the resources
of taxation are not only unfounded, but contrary to all our
experience.    The largest class of exempt property, which
the State can tax, but which hardly any civilized community
would venture to tax, includes those outlays for religious, benev-
olent, and educational purposes, to which we · owe all of our
prosperity and enlightenment.    These investments return no
revenue, and all that would be paid to the State would be di-
verted from uses which benefit the State.    Beyond this there
are some qualified, and some absolute exemptions which have
been paid for in advance, or which are supposed, and usu-
ally with justice, to produce more additions to the taxable
property of the community than they withhold; while even
that which is withheld is of their own creation, and not
subtracted from any previous stock.    It is no new thing
for a public corporation to act as a private business man
would under the same circumstances, and while public en-
terprises are not always safe, those men and those regions
which have risen most surely.in wealth and resources, have
often done it by judicious outlays, or reasonable encourage-
ment in reducing the burdens of those who run the risk
of costly experiments.

But whether this be so, or not, if the matter is in the
power of the Legislature, we must be content to abide by
their action.    And there is nothing in our Constitution to
prevent it.    It has expressly authorized specific taxes instead
of general assessments on the only bodies which can create
dangerous combinations and monopolies.    And this power
has been held by a majority of this Court in *Walcott v.
People, 17 Mich., 68*, to extend to all other business organi-
zations.    No kind of exemption has ever been so much
criticised in this State, as that which withdraws corporate
wealth from contributing to pay the current expenses of
the State, and relieves it entirely from any part of the lo-

cal burdens. But this has been made legal, and has very probably—if we could trace out all its results,—done much to improve the country. The Constitution has also left the Legislature at full liberty to select the objects of taxation, and what it may exempt for charity, it may agree to exempt for supposed advantages. Such a contract was upheld in the case of the *People v. The Auditor General, 7 Mich. R., 84*, in the matter of the Sault Canal lands. A similar contract in regard to swamp lands in another State was enforced in *McGee v. Mathis, 4 Wallace R., 143*, whereby purchasers of scrip were entitled to have the lands exempted from general and also from local taxation for ten years. From the decision of the case of *Wilson v. New Jersey, 7 Cranch R., 164*, to this time, such agreements have been held within the legislative authority; and such exemptions have been held binding whenever they have been claimed under a contract, and have not been purely gratuitous. The earliest case noticed this distinction, and it has always been recognized. And if there could be any difference in the treatment of agreements, the good faith of governments should never be held less sacred than that of individuals.

The law of 1861, as has been seen, withdrew the unqualified offer of exemption, and no protection, therefore, can be claimed for subsequent investments except upon the new conditions. And the real estate of the complainant, if not owned previously, would be taxable. It was suggested that the bill does not show that it was thus held.

The bill is not carefully drawn in this respect, and upon special demurrer would have required amendment. But an answer was put in and replied to, and then was withdrawn by stipulation, and a general demurrer substituted under the same stipulation. This must have been done to present the main issue alone. Under these circumstances

technical nicety cannot be required. I think it appears sufficiently that the lands are exempt. The bill shows the boring of a well and erection of salt works,—and the manufacture of over 30,000 bushels of salt before the law was changed in 1861,—that all complainant's property is used for that purpose, and that the manufacture continues where it was first commenced; and declares distinctly that all the land described is and has been in use for that purpose. Upon general demurrer averring only want of equity, and especially when thus substituted for an answer, we cannot require any greater accuracy of allegation than appears here.

It was claimed, however, on the argument, that the law of 1861, whereby this exemption was changed and limited, is valid as an alteration of the laws regulating these companies, which are subject to legislative alteration, amendment and repeal by the Constitution. I think there is no foundation for any such claim, if it can be regarded as seriously urged.

These companies are organized under the general mining and manufacturing law. Their corporate franchises are all derived from that. The Legislature could not lawfully give them except by general act. That statute is in effect their charter; and any amendments made to that, whereby their functions became varied, would govern them.

But there is no provision in the Constitution which authorizes the Legislature to take away the property of corporations. And there can be no process whereby an independent statute, in no way creating or referring to corporate franchises, can be construed as an amendment of the corporation act.

The statute of 1859 is an independent statute for the encouragement of salt manufacturing. It refers to nothing else, and had it done so, it would have been invalid. It makes the same offer to individuals and corporations. It

offers them bounties and privileges which relate entirely to property, and have nothing to do with corporate powers. It is in no respect different in principle from what it would have been had there been a money subvention instead of aid by way of exemption. If such a statute can be regarded as an amendment of the corporation law, the same would be true of an act which should divest a corporation of all its possessions. Amendments are not made in this way. The Constitution requires them to be manifested by a publication of the parts of the law as amended, so that no one can be misled by any blind provisions. Whatever amendments are made must be amendments of the organic law, and not independent statutes relating to something else.— *Art. 4* §§ *20, 25, Art. 15,* § *1.* And while corporations may be subject to many of the general laws which regulate the conduct of all persons, the alteration of their corporate privileges cannot be made except in the way the Constitution prescribes. It has never been held that a power to alter a corporation charter involves a power to deprive the corporation of rights which are acquired as possessions, and not as chartered franchises. And the rights which they acquired under the law of 1859 were not granted to them because they were corporations, but because they chose to make salt.

I think, therefore, that complainants made out a case requiring an answer, and, that which was filed having been withdrawn, they are entitled to a decree.