## Ex Parte Goodin.

1. **St. Louis Fire Wardens**: EXEMPTION FROM JURY SERVICE: VESTED RIGHT. A member of the corporation of fire wardens of the city of St. Louis, who had served as such for seven years and received a proper certificate thereof before the passage of the act of May 15th, 1877, (Sess. Acts of 1877, p. 280,) was entitled, under the acts of 1845, (p. 114,) and 1851, (p. 481,) to exemption from service as a juror; his right to exemption had become vested, and it was beyond the power of the State, by subsequent legislation, to annul or abrogate it.

2. **Habeas Corpus**: EXEMPTION FROM JURY SERVICE: CONTEMPT. A person who has been committed for contempt, in refusing to serve as a juror, is not entitled to be released on *habeas corpus*, notwithstanding the order of commitment shows upon its face that he is exempt by law from jury duty, and that he claimed his exemption. SHERWOOD, C. J., and HENRY, J., dissenting.

### Petition for Habeas Corpus.

*Samuel Reber* for petitioner, cited upon the first point: Pom. Const. Law, pp. 364, 369, 370 and 378; *Woodruff v. Trapnall*, 10 How. 190; *Home of the Friendless v. Rouse*, 8 Wall. 430; *State of New Jersey v. Yard*, 95 U. S. 104.

SHERWOOD, C. J.—The petitioner, Goodin, was imprisoned for the space of ten days, by the order of the court of criminal correction, because of an alleged contempt in refusing to do service as a juror in that court, he claiming exemption from such service by reason of the fact that, first, he is a certified member of the fire wardens of the city of St. Louis, having served seven years as such; second, that he is a member of a volunteer fire company, duly organized and ready for active service. This application presents two salient questions for adjudication: First, whether petitioner is really exempt as claimed; second, whether, if thus exempt, the benefits of such exemption can be successfully asserted in the method which the counsel for petitioner have here seen fit to adopt.

1.   As to the first point, under the express terms of the acts of 1845 and 1851, referred to in the brief of counsel, we entertain no doubt whatever that petitioner, having served for the period of seven years as a member of the fire wardens of St. Louis, and received his certificate evidencing that fact, is clearly entitled to exemption from jury service. The State, by those statutes and their acceptance by petitioner, entered into a contract with petitioner, which was supported by a valuable consideration, to-wit: the service to be rendered, and which, when rendered, constituted a complete and executed contract, which the State, by subsequent legislation, was powerless to annul or abrogate. This doctrine has been so familiar to the profession ever since the decision in *Dartmouth College v. Woodward,* 4 Wheat. 518, and other cases which followed in its wake, that citation of authorities in its support would scarcely seem necessary. It is true this doctrine was long resisted by many of the State courts, and the case of the *Commonwealth v. Bird,* 12 Mass. 442, cited by the learned judge of the St. Louis court of appeals in the opinion in *ex parte Powell,* filed with the return herein, was decided prior to the leading case above noted, when as yet an au-

thoritative enunciation of the governing constitutional principles in regard to such matters had not been put forth by the Federal Supreme Court, the final arbiter in this respect. The authorities on this subject are collated in Pom. Const. Law, pp. 365, 369, 370, 378, and in Sedg. Stat. and Const. Law, pp. 586, 587, *et seq.* and notes. The case of *Tomlinson v. Jessup*, 15 Wall. 454, does not, perhaps, militate against the view here taken when closely considered, and, if it does, it is not in harmony with the leading authorities. There the right to tax all corporations was expressly reserved by the act of 1841, in force when the charter of the Northeastern Railroad Company was granted, and, in the language of the opinion, the provisions of that law "were as operative, and as much a part of the charter and amendment, as if incorporated into them." But the distinguishing feature of this case, however, is that here services were contracted for and had been fully performed anterior to the legislative exercise of the reserved power of repeal. Every inducement was held out to the corporators; the State, through her charter, saying to them, Go on and serve as fire wardens for seven years and your exemption from jury service is hereby made secure. Doubtless a different case would be presented had the State's reserved power of repeal been exercised before the expiration of the seven years—before the contract had been consummated and the inchoate right of exemption had become, by reason of the services rendered, a vested one. Even in a case where no charter was granted, but a mere bounty offered, to *all* citizens who should engage in the manufacture of salt, it was held that, after the bounty of ten cents per *bushel* had been *actually earned* under the law of 1859, the bounty thus earned was not affected by the act of 1861, which reduced the amount of the bounty to ten cents per barrel, as a vested right had been acquired under the former act. *People v. Auditor*, 9 Mich. 134; *Montgomery v. Kasson*, 16 Cal. 189; *Salt Co. v. East Saginaw*, 19 Mich. 259; *s. c.*, 13 Wall. 373. In the case last cited it is said by

Bradley, J.: "Such a law is not a contract, except to bestow the promised bounty upon those who *earn it so long as the law remains unrepealed.*" Assuredly the case at bar presents as decided marks of a vested right as in the cases above cited. We, therefore, hold as undoubted the petitioner's right to exemption from jury service. This renders it unnecessary to consider whether the petitioner is otherwise exempt.

2. We are thus brought to the consideration of the second branch of our subject. Our *habeas corpus* act (section 33) provides: "It shall be the duty of the court or magistrate forthwith to remand the party if it shall appear that he is detained in custody   *   *   for any contempt, specially and plainly charged in the commitment, by some court, officer or body having authority to *commit* for a contempt so charged."   *   *   And the same act (section 36) further provides: "But no court, under the provisions of this chapter, shall   *   * have power to inquire   *   *   into the justice or propriety of any commitment for contempt made by any court, officer or body according to law, and plainly charged in said commitment, as hereinbefore provided." If our first position in reference to the exemption of the petitioner from jury service be correct, and the order of commitment shows that the court making that order found the facts to be as stated by petitioner, it would seem to follow that the order shows upon its face neither a "contempt specially and plainly charged in this commitment," nor "authority to commit for a contempt *so charged*." And this result must follow unless it be true that the mere assertion in a court of law of a right bestowed by law is a criminal contempt of the law. This is no doubtful case, where there is room to indulge in presumptions favoring the correctness of the action of the court in making the order; for here the facts constituting the exemption stand admitted upon the record of the commitment, and the provisions of those statutes which give those facts their pecul-

iar significance are also spread at large there. This view
does not antagonize our former decisions, but, on the
contrary, is in accord therewith. None of them have ever
gone so far as to declare that we would not investigate a
matter on *habeas corpus* where it was apparent that the
court making the order of commitment had no jurisdiction
whatever. Thus, in *ex parte McKee*, 18 Mo. 599, it was
said that, while a notary public could imprison a witness
for contempt in refusing to give evidence " which may *law-
fully* be required to be given," yet the notary could
not *lawfully* compel a witness to answer as to matters which
it was the privilege of the witness to refuse to answer. It
was impossible to determine in that case whether the
questions were relevant or not, and so their relevancy, and
the consequent authority of the notary to ask and to com-
mit for a refusal to answer them, was assumed by this
court. So that it is fairly inferable from that case that, if
the order of commitment had shown that the notary acted
outside of his jurisdiction in demanding answers to privi-
leged questions, relief would not have been denied the
petitioner.

In *ex parte Toney*, (11 Mo. 662,) so often referred to,
the jurisdiction of the court over the subject matter and
person was expressly shown by the record, and stress is
laid by Napton, J., on this state of the record when deliv-
ering the opinion of the court, holding, as he very prop-
erly did, that these record recitals showing *jurisdiction*
could not be collaterally attacked by a proceeding in
*habeas corpus*. No one can read that opinion with any
degree of attention without speedily reaching the conclu-
sion that, had the *record* in that case shown that Toney was
a slave and that consequently the criminal court of St.
Louis county had no *jurisdiction* to sentence him to the
penitentiary, this court would not have denied the writ.
And this is evidently the view taken of that case in *ex
parte Page*, 49 Mo. 291. Under our jury system jurors are
required to be white *male* citizens, (Wag. Stat., sec. 2, p.

797.) Suppose that a *woman* should be summoned as a juror, should appear, plead her exemption in consequence of her sex; should refuse to do jury service, and the court should commit her for contempt, reciting in the order of commitment the fact of her sex, but deciding that, under the law, she was not exempt, and was liable to punishment for contempt. Can it be doubted that such palpable lack of jurisdiction could be taken advantage of by *habeas corpus?* And yet a woman is only *negatively* exempt from jury service—exempt because not expressly included in the list of those required by law to serve in that capacity. The court in such an instance would indeed have jurisdiction over the *subject matter*—to-wit: the impaneling of the jury—but none whatever over the *person* of the woman; and the record reciting the above supposed facts would show an entire absence of jurisdiction to require such service at her hands, and, consequently, that *no contempt* had been committed. Would the writ of *habeas corpus* be less effective in a case like the present, where the record shows a law which in explicit terms upon the facts admitted exempts the petitioner? Surely not. Mr. Hurd, in his work, (Hurd Hab. Corp., 327, 2 Ed.,) evidently holds to the same opinion as here announced, for, in speaking of defects cognizable under *habeas corpus,* he says : " The jurisdiction over the process being only *collaterally* appellate, the *h ibeas corpus,* as before intimated, cannot have the force and operation of a writ of error or a *certiorari,* nor is it designed as a substitute for either. It does not, like them, deal with errors or irregularities which render a proceeding voidable only, *but with those radical defects which render it absolutely void.* * * A proceeding defective for irregularity and one void for illegality may be reversed upon error or *certiorari,* but it is the latter defect only which gives authority to discharge on *habeas corpus."* And, after giving the usual definition of irregularity, the author proceeds (p. 328) : " *Illegality* is, properly, predicable of radical defects only, and signifies that which is con-

trary to the principles of law as distinguished from mere
rules of procedure. It denotes ' *a complete defect in the pro-
ceedings,*' and it would seem to be entirely immaterial, in
point of principle, whether the ' complete defect in the
proceedings,' ' contrary to the principles of law,' be exhib-
ited by the record in a commitment for a *crime* or a com-
mitment for a *contempt,* as in either case a lack of author-
ity to make the order would be patent of record, and there-
fore liable to collateral attack by *habeas corpus.*" The same
views of the functions of the *habeas corpus* are elsewhere
announced. In *ex parte Perkins* (18 Cal. 60) the petitioner
had been committed for contempt in failing to obey the
order of the court to pay the expenses incurred by his
wife in an action for divorce, and Baldwin, J., speaking for
the court, said: " It is not admissible for the defendant in
a proceeding of this sort to question the mere *regularity* of
the proceedings. We do not sit as an appellate court in
matters of this sort, but a court of original jurisdiction, in-
vested with a special jurisdiction to discharge the peti-
tioner when *no legal* cause of detention exists against him.
*　　*　The only question, therefore, which he can
make as affecting the legality of his commitment involves
*the power* of the court to make the order. And upon this
question we have no doubt." And having no doubt as to
the *legality* of the order, the court refused to issue the
*habeas corpus,* and, for the same reason, refused a *certiorari*
to bring up the record.

In the State of New York the *habeas corpus* act is, so
far as concerns the point being discussed, like our own,
and, in *the matter of Percy,* (2 Daly 530,) Daly, J., said:
" My inquiry is limited by statute to two points: (1) Is
the contempt specially and plainly charged in the com-
mitment? (2) Had the officer authority to commit for
the contempt which is charged? In respect to the first, the
circumstances are set forth in the order of commitment,
*and they amount to* a criminal contempt.; *　　*
and, in respect to the second, a justice of the Supreme

Court has authority to commit for such a contempt;" and so the petitioner was remanded. It cannot be doubted that a different result would have ensued if the circumstances set forth in the commitment *had not amounted* to a criminal contempt. In *re Fernandoz*, (10 C. B. 3,) where a witness was committed for a refusal to answer questions, and sought to be released upon the ground that the commitment was illegal, a most elaborate discussion followed, in which all the judges participated   The warrant of commitment found and set out the nature of the contempt, and was held good. But Byles, J., said: "If a warrant be made out stating the facts, as in Bushell's case, (Vaughan 135,) and showing on the face of it that the alleged contempt *was no contempt in point of law*, that warrant would no doubt be bad." In *People v. Hackley* (24 N. Y. 75) the prisoner had been confined for contempt in refusing to answer certain questions propounded to him before the grand jury.   Denio, J., in delivering the opinion of the court, remarked:   "As a general rule, the propriety of a commitment for contempt is not examinable in any other court than the one by which it was awarded.   This is especially true where the proceeding by which it is sought to be questioned is a writ of *habeas corpus*, as the question on the validity of the judgment there arises collaterally, and not by way of review.   The *habeas corpus* act, moreover, declares that, where the detention of the party seeking to be discharged by *habeas corpus* appears to be for any contempt, plainly and specially charged in the commitment, ordered by a court of competent jurisdiction, he shall be remanded to the custody in which he was found.   But this rule is, of course, subject to the qualification that the conduct charged as constituting the contempt must be such that some degree of delinquency or misbehavior can be predicated of it; for if the act be plainly indifferent or meritorious, or if it be only the assertion of the undoubted right of the party, it will not become a criminal contempt by being adjudged to be so.   The question whether the

alleged offender really committed the act charged will be conclusively determined by the order or judgment of the court; and so with equivocal acts which may be culpable or innocent, according to circumstances, but where the act is necessarily innocent or justifiable it would be preposterous to hold it a cause of imprisonment."

In *Gilliam v. McJunkin*, 2 S. C. 442, an administrator, having failed to pay a sum of money into court as ordered, was arrested, and sought to be discharged by *habeas corpus*, and the court said: " The high prerogative writ of *habeas* ✦ *corpus* applies to all manner of illegal confinement." A party committed for a contempt, adjudged by a court of competent jurisdiction, will not be discharged under it. If, however, the alleged contempt is for disobedience of an order in which the court, in the matter before it, was without jurisdiction, the court having the right to grant the writ may inquire into the legality of the caption and detention.      *      *      " In a matter clearly within its jurisdiction, the action of one court is beyond the control of any other, save by way of appeal where that mode of revision is provided by law.   Where, however, a court in so important a matter as that which affects personal liberty oversteps the limits of its authority, and endeavors to enforce obedience to its unauthorized acts, it would be a reflection on the administration of public justice if there was no jurisdiction to which the imprisoned citizen could resort for enlargement."   The Supreme Court of Texas, where a witness was imprisoned for contempt in refusing to answer certain questions propounded to him by the mayor, held that under ordinary circumstances it was a contempt for a witness to refuse to answer questions, but that if the questions were improper and illegal—if they were in reference to matters over which the court had *no jurisdiction*, and about which it had *no right* to inquire—the refusal to answer the interrogatory was *no contempt* of court, and any order punishing it as such was void, and the witness entitled to his discharge on *habeas corpus*.   *Holman v.*

*Mayor*, 34 Tex. 668.   So, also, in *ex parte Summers*, 5 Ired.
149, where a person had been committed for a contempt,
Ruffin, C. J., remarked : " If there be insufficiency upon the
face of the order, the party has his remedy by *habeas cor-
pus.*     *     *     The facts constituting the alleged con-
tempt need not be stated.   If, indeed, they be stated, and
be *insufficient*—that is, be such as manifestly *cannot amount*
to a contempt—it seems properly agreed that it must be
disregarded and the party discharged from an unlawful
imprisonment, as in Bushell's case,(Vaughan 135,) where he
was committed " for giving a verdict against full and clear
evidence."   That the court had jurisdiction in Bushell's
case to punish Bushell, or any one else in its presence, for
a contempt is evident, but, having spread upon its records
facts which by no possibility could amount to a contempt,
its commitment was a nullity, and so held."   That case
would seem directly in point.   I am fully aware there is a
conflict of authority in reference to this matter.   Many of
the authorities opposed to the views here advanced will be
found cited in *State v. Towle,* 42 N. H. 540.

Were this case one not free from doubt as to whether
the petitioner was exempt under the law—were it not patent
of record, by reason of the facts there recited and admitted,
that the criminal court had no more jurisdiction over
his person than if he had been a woman or an infant—it
would not be permitted to question collaterally the valid-
ity of the order of commitment in the present instance;
but since it is plain that petitioner, upon the recorded facts,
is exempt under the law from jury service, it must needs
follow that he has not been guilty of a contempt, and that
the jurisdiction of the court of criminal correction imme-
diately ceased when those facts constituting the exemption
were judicially ascertained and declared.   Again, if we
admit that petitioner is exempt under the law, it would
seem clear that petitioner is entitled to his discharge under
the very terms of the statute, because the act does not
merely say that the petitioner shall be remanded if detained

in custody for any contempt, specially and plainly charged in the commitment, by some court, officer or body having authority to commit for a contempt, but the significant words are added, "*so charged.*" If the Legislature had intended that *every* commitment for contempt should be conclusive against redress by *habeas corpus* when the court, &c., had *a general* authority to commit for contempt, the words "*so charged*" would possess not the slightest signification, and, therefore, I must think that, unless that which *is* charged in the commitment amounts to a contempt when "*so charged,*" a petitioner who seeks relief by *habeas corpus* should have such relief granted him. We are all agreed that petitioner is exempt from jury service, but Judges NAPTON, HOUGH and NORTON do not think the petitioner entitled to the writ. Judge HENRY concurs with me on all points. The result is that we refuse to issue the writ.

WRIT REFUSED.